**ATLANTIC MECHANICAL, INC., Plaintiff,**

v.

**RESOLUTION TRUST CORPORATION as Receiver for Atlantic Permanent Savings Bank, F.S.B., Defendant.**

**Civ. A. No. 90–1489–N.**

United States District Court, E.D. Virginia, Norfolk Division.

Sept. 19, 1991.

Nunc pro tunc Feb. 27, 1991.

---

John R. Lomax, Fine, Fine, Legum & Fine, P.A., Virginia Beach, Va., for plaintiff.

Jane Dandridge Tucker, Geoffrey F. Birkhead, Vandeventer, Black, Meredith & Martin, Norfolk, Va., for defendant.

## MEMORANDUM OPINION

REBECCA BEACH SMITH, District Judge.

This matter came before the court for a bench trial.[1] Atlantic Mechanical, Inc. ("AMI") originally filed this action in state court on a breach of contract claim against Atlantic Permanent Savings Bank, F.S.B. ("the Bank"). Subsequently, upon motion of the Bank and with the agreement of the parties, Resolution Trust Corporation as Receiver for the Bank ("RTC") was substituted as the proper party defendant. A week later, RTC filed a notice of removal on the grounds that, pursuant to 12 U.S.C. § 1441a(a)(11), this court has original jurisdiction over any action in which RTC is a party. In its answer, RTC claimed that it had the authority, under 12 U.S.C. § 1821, to repudiate the contract in question.

### I. FACTS

On March 1, 1989, AMI and Atlantic Permanent Savings Bank ("Atlantic Permanent")[2] entered into a written contract under which AMI was to provide preventive maintenance for the heating and air conditioning equipment at eight of Atlantic Permanent's locations, for a term of five years at the cost of $16,560 per year, payable in full each March 1st for the upcoming year.[3] In December, 1989, the Office of Thrift Supervision of the United States Department of the Treasury closed Atlantic Permanent, pursuant to the Homeowner's Loan Act of 1933. RTC was appointed as receiver for Atlantic Permanent, which was renamed Atlantic Permanent Savings Bank, F.S.B. ("the Bank").

In late March, 1990, the Bank's purchasing director resigned in the midst of an

---

1. The court rendered this opinion orally from the bench on February 27, 1991, and the Clerk entered judgment in favor of defendant on February 28, 1991. Plaintiff timely noticed an appeal. Counsel for Resolution Trust Corporation has requested that the court's opinion be put in written form.

2. Atlantic Permanent Savings Bank, the name of the bank prior to receivership, should not be confused with Atlantic Permanent Savings

Bank, F.S.B. ("the Bank"), the bank's name while in receivership.

3. The contract required AMI to perform one inspection per month of the heating and air conditioning equipment at each of the eight locations, including checking, lubricating, and adjusting the equipment, and changing the filters.

investigation of alleged improprieties in several areas of contracts and supplies. Carey Parker, the Bank's personnel director, became the new purchasing director for the Bank. One of the responsibilities given to Parker, as purchasing director, was to review all of the Bank's contracts.[4] The contract with AMI, and the related work orders and repair invoices,[5] were part of this review. Parker concluded that both the contract price and contract term[6] were excessive and that the number of repairs seemed high. Parker also suspected that AMI had been making repairs without the Bank's prior approval, with work orders being prepared after the repairs had been made.

As a follow-up to his inquiries into the AMI contract, Parker telephoned Edward James Sumrell, President of AMI, on May 7, 1990, and scheduled a meeting for May 10, 1990. At that meeting, Parker voiced his concerns about the contract price and term, and explained that because the Bank was in receivership, the Bank was scrutinizing all contracts. Parker told Sumrell that the Bank would have to repudiate some contracts and renegotiate others. He asked Sumrell if AMI would be willing to renegotiate the preventive maintenance contract. Sumrell indicated that he could not answer that question without speaking with AMI's board of directors.[7] Apparent-

ly, Sumrell spoke with the board of directors and then called Parker to let him know that AMI was not willing to renegotiate the contract.[8]

On May 24, 1990, Parker sent a letter to Sumrell advising him that the Bank was discontinuing the maintenance work on the heating and air conditioning equipment and that AMI should not perform any additional work or inspections without authorization. William H. White, Executive Vice President of the Bank, recommended to Mr. Branum, RTC's Managing Agent for the Bank, that RTC repudiate the contract, based on its excessive term and price. In accordance with Branum's instructions, White officially repudiated the contract, effective May 31, 1990, by certified letter dated June 6, 1990, and mailed to AMI.[9]

Subsequently, on behalf of the Bank, Parker solicited bids on the preventive maintenance work from five heating and air conditioning businesses.[10] Of the five companies Parker contacted, three responded with bids. Tidewater Service America and Beach Mechanical each submitted bids of approximately $10,000 to $11,000 per year for monthly inspections of the eight facilities for a one-year term. H.M. Webb & Associates ("Webb") bid $3,440 per year for quarterly inspections of all eight facilities.[11] According to H.M. Webb, the sole

---

4. Mr. Parker had previous experience as a purchasing director with another bank, where he had specifically reviewed this type of agreement.

5. Repairs were not included in the preventive maintenance contract. However, as the company inspecting and maintaining the equipment, AMI was in the best position to make repairs and had been repairing the equipment as well as maintaining it.

6. The Bank had already paid for two years of maintenance, leaving three years in the contract term.

7. Sumrell testified that in May, 1990, the board of directors consisted of Bill Miller, the vice president; Joyce Miller, the secretary; Sumrell, the president; and his wife Stephanie Sumrell, the treasurer.

8. According to Sumrell's testimony, the board of directors held a formal meeting to discuss the

possibility of renegotiating the contract, but did not take minutes or keep any record of the meeting.

9. The letter also contained a request for reimbursement of $12,420, the unused portion of the year's advance payment on the preventive maintenance contract. As of trial, AMI had made no reimbursement. However, the requested reimbursement is not at issue in the instant action.

10. Sumrell contacted Parker during the bid solicitation process and indicated that AMI would like to submit a bid. Parker responded that AMI had already had an opportunity to reduce its price and term, but had chosen not to adjust the contract. Parker told Sumrell that he would not accept a bid from AMI.

11. The Webb bid did not include filters, which cost approximately one dollar each. *See infra* note 14. H.M. Webb, the sole owner of Webb, testified that his company does not include filters in the maintenance agreement because it is

owner of Webb, the Webb bid was for no specified term. He testified that any time a customer is unsatisfied, the customer can cancel the maintenance agreement.

Based on Mr. Webb's opinion that quarterly inspections would be sufficient to maintain the equipment properly,[12] Parker concluded that a lesser price for a lesser term was the best option for the Bank, and he recommended Webb's bid to White. White agreed with Parker's recommendation and accepted Webb's bid.[13]

## II. LEGAL ANALYSIS

The statute that governs RTC's legal authority to repudiate the contract is 12 U.S.C. § 1821(e)(1):

> [T]he conservator or receiver for any insured depository institution may disaffirm or repudiate any contract or lease—
> (A) to which such institution is a party;
> (B) the performance of which the conservator or receiver, in the conservator's or receiver's discretion, determines to be burdensome; and
> (C) the disaffirmance or repudiation of which the conservator or receiver determines, in the conservator's or receiver's discretion, will promote the orderly administration of the institution's affairs.

The parties stipulated that RTC was the receiver for the Bank, an insured depository institution. Therefore, RTC has the legal right under this statute to review all of the Bank's contracts and to determine, in its discretion, if any contract is burdensome and if the repudiation of any contract would promote the orderly administration of the Bank's affairs. This statute clearly gives RTC broad authority, so that RTC, as receiver, can reduce the Bank's liabilities and put it on firm operating ground as quickly as possible.

The issue before this court is whether RTC abused its discretion in deciding that the contract with AMI was burdensome and that the contract's repudiation would promote the orderly administration of the Bank's affairs. The court finds no abuse of discretion. The evidence shows that the AMI contract was not competitive in that market because the cost was high for the service rendered, the contract was for more service than the Bank needed, and the term far exceeded the industry standard.

With respect to the cost, in the eight months prior to trial while under the Webb contract, the Bank spent approximately $8,300 on the preventive maintenance agreement and all repairs. Quarterly inspections appear to have been sufficient. In comparison, for the final fourteen months under the AMI maintenance contract, the Bank spent $16,560 on the contract price and $41,000 on repairs. AMI contracted for ninety-six inspections per year, whereas Webb contracted for only thirty-two inspections annually. However, even comparing the average price of the two contracts per inspection, AMI's average fee is over sixty percent higher.[14]

White testified that he did not feel comfortable, after looking into the services rendered by AMI, that AMI was acting in the

---

less expensive for customers to be billed for filters as needed. When the price of filters is included in the contract price, the filters must be changed at each inspection, even when unnecessary.

**12.** Mr. Webb has forty years experience in the heating and air conditioning business, and his company has been in business for eighteen years. Moreover, his company currently has approximately 300 preventive maintenance agreements, and he had performed the preventive maintenance services for Atlantic Permanent for the thirty-five years prior to the contract with AMI in 1989.

**13.** White testified that the ability to cancel the contract on a quarterly basis was particularly

appealing because the absence of a long-term commitment would facilitate disposal of the assets of the receivership and would minimize the length of time the receivership's affairs remained obligated.

**14.** Webb charged $3,440 per year for four inspections of each of the eight sites for an average cost of $107.50 per site. In contrast, AMI charged $16,560 per year for twelve inspections of each of the eight sites for an average cost of $172.50 per site. In contrast to the Webb contract, the AMI contract included filters. However, Sumrell testified that each filter costs approximately one dollar. Therefore, even if the cost of filters is taken into account in comparing the two contracts, the AMI fee remains significantly higher.

Bank's best interests. He cited as an example an instance in which AMI advised the Bank that the bearings on one of the system's motors were deteriorating and should be replaced. Due to the expense of replacing the bearings, and the fact that the Bank had already spent $41,000 on repairs to the heating and air conditioning systems that year, and because the Bank had never before experienced this problem, the Bank requested a second opinion from another air conditioning company. This second company did not recommend that the Bank replace the bearings, because, although the bearings were deteriorating, they could last for another three to four years, or for the life of the motor.

White also found the contract term to be burdensome. *See supra* note 13. Two expert witnesses testified that a one-year contract term is standard in the industry. Sumrell himself testified that a five-year preventive maintenance contract is unusually long.

The court CONCLUDES that RTC did not abuse its discretion in finding the AMI contract burdensome and in determining that the repudiation of the AMI contract would promote the orderly administration of the Bank's affairs. In fact, the court FINDS that the AMI contract is a burdensome contract, due to the contract term and price, which contract would impede the orderly administration of the Bank's affairs. In addition, the court FINDS that the Bank did not act in bad faith in this case because the Bank was evaluating all of its contracts and the Bank gave AMI an opportunity to renegotiate its contract.

Because RTC did not abuse its discretion in repudiating the contract, RTC's liability to AMI is limited by 12 U.S.C. § 1821(e)(3), to "actual direct compensatory damages" which do not include "damages for lost profits ·or opportunity." Plaintiff has failed to prove any damages other than lost profits and opportunities. Consequently, ·plaintiff is not entitled to recover any damages from RTC.[15]

---

**15.** As an alternative ruling, if this action were to be treated solely as a contract action apart from the receivership laws, the court would rule that the contract was not breached, due to the contract's conflicting provisions. One paragraph of the contract permits either party to cancel the contract by giving thirty days written notice; another paragraph characterizes the agreement as a five-year, noncancellable contract. The ambiguous and conflicting contract terms should be strictly construed against the drafter, here AMI. Therefore, Parker, on behalf of the Bank, cancelled the contract with AMI by letter dated May 24, 1990. *See supra* at 290. Allowing three days for mailing, the cancellation was effective June 27, 1990.