**CITIBANK (SOUTH DAKOTA), N.A., Plaintiff,**

v.

**FEDERAL DEPOSIT INSURANCE CORPORATION in its own capacity and as Receiver for Bank of New England, N.A., The Connecticut Bank and Trust Company, N.A., and Maine National Bank, Defendants.**

Civ. A. No. 92–0162.

United States District Court, District of Columbia.

April 14, 1993.

John A. Buchman, Alston & Bird, Washington, DC, for plaintiff.

Lloyd H. Randolph, White & Case, J. Christopher Kohn, U.S. D.O.J., Commercial Branch, Washington, DC, for defendants.

## MEMORANDUM OPINION

THOMAS F. HOGAN, District Judge.

On March 26, 1993, this Court conducted a hearing to consider whether, as a matter of law, the Financial Institutions Reform and Recovery Act ("FIRREA") protects the Federal Deposit Insurance Corporation ("FDIC") from liability for damages caused by repudiation of a non-compete provision.[1] Based on the arguments and authorities presented by the parties in their briefs and during the hearing, the Court found that the non-compete provision could have value prior to repudiation and that the FDIC could be held liable for damages as a result. Accordingly, the Court granted plaintiff's motion for partial summary judgment and denied defendants' motion. This Opinion memorializes this Court's March 26, 1993 bench ruling.

## I. BACKGROUND

Citibank (South Dakota), N.A. ("Citibank"), brings this case against the FDIC in its capacity as the appointed receiver for Bank of New England, N.A., The Connecticut Bank and Trust Company, N.A., and Maine National Bank (collectively referred to as the "BNE" Banks).[2]

---

1. Also before the Court is plaintiff's Motion to Strike portions of the Declaration of Elaine Weeks. The Court did not rely on the Week's Declaration in its March 26, 1993 bench ruling or in this Memorandum Opinion. Because the Declaration related only to the cross-motions, plaintiff's argument is moot and the Motion to Strike is denied.

2. By stipulation, the case was dismissed against the FDIC in its corporate capacity.

On January 28, 1990, prior to the FDIC's appointment as receiver of the BNE Banks, Citibank entered into a contract, the Credit Card Portfolio Purchase and Sale Agreement ("the ·Agreement"), to purchase certain assets and assume certain liabilities associated with the credit card businesses of the BNE Banks. Although the book value of the credit card receivables was approximately $640 million, Citibank paid a total of approximately $820 million for the portfolio. Citibank claims that part of the $180 million premium represents a payment for contractual rights, including a covenant preventing the BNE Banks and their successors from soliciting credit card business from former BNE cardholders. Citibank calculates that $36.1 million of the $180 million premium was attributable to the non-compete provision, and it seeks $27.899 million in damages as the present value of that $36.1 million.[3]

It is undisputed that Citibank requested the four year non-compete provision as a condition to the sale. FDIC notes, however, that a monetary value was never assigned to the provision. Citibank never recorded the provision as a separate asset on its books, despite its own internal accounting practices requiring that "any intangible assets that can be identified and valued be allocated a separate portion of the purchase price."[4]

On January 6, 1991, the Comptroller of the Currency declared the BNE banks insolvent and named the FDIC as receiver. In preparation for sale of the BNE Banks' assets, the FDIC repudiated the Agreement pursuant to 12 U.S.C. § 1821(e)(1). Less than one month later, the FDIC announced the sale of the BNE Banks to Fleet/Norstar Financial Corporation ("Fleet") without the encumbrance of the non-compete provision. Citibank, believing it was entitled to compensation for the value of the repudiated non-compete provision, filed timely proof of its claims with the FDIC. The FDIC disallowed the claims on

January 3, 1992. Citibank now brings suit, pursuant to 12 U.S.C. § 1821(d)(6), for a judicial determination of its claims.

## II. DISCUSSION

### A. Legal Standard

Federal Rule of Civil Procedure 56(c) permits a court to grant summary judgment when the evidence in the record shows that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party bears the burden of showing that there is no genuine issue of material fact[5] or that the opposing party has failed to make a showing sufficient to establish the existence of an element essential to that party's case. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). When the moving party has carried its burden, the burden shifts to the nonmoving party to "come forward with 'specific facts showing that there is a *genuine issue for trial.'*" *Matsushita Elec. Industrial Co. v. Zenith Radio,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (citations omitted) (emphasis in original). The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* at 586, 106 S.Ct. at 1356. In reviewing the evidence, a court must draw all reasonable inferences in favor of the nonmovant. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986). Then, only when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party," *Matsushita,* 475 U.S. at 587, 106 S.Ct. at 1356, is summary judgment appropriate.

### B. Measure of Damages under FIRREA

FIRREA gives the receiver of a failed bank the right to repudiate any contract or lease:

3. Citibank also claims $973.3 thousand for expenses in providing services to lost clients, and $304.1 thousand for an equalization claim. By mutual consent of the parties, both prayers are held pending outcome of summary judgment.

4. FDIC also notes that Citibank failed to separately value the non-compete provision on its tax

returns, although a separate valuation would have allowed faster depreciation.

5. To determine whether there is a genuine issue as to a material fact, it is proper for the Court to rely on the pleadings, depositions, affidavits and answers. *Celotex,* 477 U.S. at 322, 106 S.Ct. at 2552.

(A) to which such institution is a party; (B) the performance of which the conservator or receiver, in ... [their] discretion, determines to be burdensome; and (C) the disaffirmance ... [of which] will promote the orderly administration of the institution's affairs.[6]

12 U.S.C. § 1821(e)(1). Section 1821(e)(3) lessens the impact of repudiation by allowing certain damage claims against receiver. While actual compensatory damages are permitted, punitive, exemplary and lost profits damages are specifically excluded. § 1821(e)(3)(B); *see also Howell v. FDIC,* 986 F.2d 569 (1st Cir.1993).

Under § 1821(e)(3)(A)(ii), damages caused by repudiation are measured on the date the receiver was appointed, not on the date of repudiation. *Office and Professional Employees Int'l Union, Local 2 v. FDIC,* 813 F.Supp. 39 (D.D.C.1993). Damages caused by repudiation which are fixed and determined on the date of receivership are recoverable.[7] *Id.* at 43 (recoverable damages are those which are determined as opposed to determinable; only actual and not hypothetical claims are allowed under FIRREA); *Pioneer Bank & Trust Co. v. Resolution Trust Corp.,* 793 F.Supp. 828, 831 (N.D.Ill.1992) (holding receiver liable for existing obligations of insolvent institution for which there were no remaining contingencies). A recoverable claim must represent an amount due and owing at the time of the declaration of insolvency, although the specific amount of the claim may be established later. *Debabneh v. FDIC,* 971 F.2d 428, 434 (10th Cir. 1992) (citing *Kennedy v. Boston–Continental Nat'l Bank,* 84 F.2d 592, 596 (1st Cir.1936)). The Court must first consider whether the contractual right at issue vested prior to the appointment of the FDIC as receiver.

Defendants contend that Citibank's claim was contingent on the date of insolvency because it did not arise until the FDIC repudiated the Agreement. Although superficially such reasoning appears consistent with § 1821(e), this argument conflicts with the statutory intent of FIRREA to allow claims for contracts in force prior to insolvency. Defendants' reasoning could be extended to deny any contractual claim arising from repudiation. Such claims are always contingent on the date of insolvency because a receiver cannot repudiate a contract until after it is appointed.

■ In the Court's view, the crucial question is whether Citibank had an unqualified right to expect performance of the non-compete provision on the date of receivership. *See Local 2,* 813 F.Supp. at 45 (questioning whether bank had obligated itself to honor claims prior to insolvency). Citibank's claim meets this test. The non-compete provision was a valuable contractual right that was fully paid for and operative prior to the date the BNE Banks declared their insolvency. Prior to the date of receivership, Citibank had an unqualified right to expect that the BNE Banks and all other successors in interest to the BNE Banks would perform their obligations under the non-compete provision. There were no contingencies or conditions to the banks' obligations to perform.

Defendants attempt to equate the non-compete provision at issue with a penalty clause in a lease or employment contract. This analogy is misplaced. Such cases involve contingent claims which do not become fixed until after repudiation.[8] *Kennedy v. Boston–Continental Nat'l Bank* illustrates this distinction. 84 F.2d 592 (1st Cir.1936). In *Kennedy,* the First Circuit denied a claim for liquidated damages against a receiver

---

6. The parties do not dispute the FDIC's power to repudiate the Agreement.

7. To the extent that FIRREA mirrors older law requiring accrual of the claim prior to insolvency, 12 U.S.C. § 1821(e) is a codification of common law principles. *Bayshore Exec. Plaza Partnership v. FDIC,* 750 F.Supp. 507, 509 (S.D.Fla. 1990), *aff'd* 943 F.2d 1290 (11th Cir.1991).

8. Courts have uniformly held that employment contracts with severance payments are non-vest-

ed since the right to payment is usually conditioned upon termination of employment, an event which occurs post-receivership. *Carney v. Boles,* No. 90–0788 (W.D.La. Sep. 19, 1990). Employment contracts differ from other contracts by providing damages for lost future profits, which is prohibited under § 1821(e). *Id.* at 4. *See also Howell v. FDIC,* 986 F.2d 569, 572 (severance agreements are analogous to liquidated damages and are not "actual direct compensatory damages").

because it found that the insolvent bank's liability had not arisen and become fixed prior to receivership. Activation of the liquidated damages clause contained in the lease required written notice and re-entry as conditions precedent, neither of which occurred prior to the bank's insolvency. *Id.* at 597. Unlike the plaintiff in *Kennedy,* Citibank had an unconditional right to performance under the non-compete provision prior to receivership.

Defendants further argue that Citibank knew of and assumed the risk of repudiation because it signed the Agreement after FIRREA came into effect. The mere fact that Citibank was aware of a risk of repudiation, however, does not excuse the FDIC from its statutory duty to compensate for damages caused by the repudiation of contracts in force on the date of receivership. Leaving such injured parties uncompensated would greatly affect the amount that troubled, but still solvent, banks receive for selling assets to stay afloat. The risk of uncompensated FDIC repudiation would devalue assets and raise the cost of bailout if the bank did not survive.[9]

## C. Type of Damages Available under § 1821(e)

■ To succeed, Citibank's claim must overcome the damage limitations codified in § 1821(e)(3)(B), which allow only "actual direct compensatory damages." Section 1821 expressly excludes punitive or exemplary damages, damages for lost profits or opportunity, and damages for pain and suffering. Defendants concede that Citibank's claim is compensatory. However, defendants claim that Citibank's damages are not "actual direct compensatory damages," but rather are damages for lost profit or opportunity.

Courts have strictly enforced the lost profit or opportunity prohibition of § 1821. In *Atlantic Mechanical v. RTC,* 772 F.Supp. 288, 292 (E.D.Va.1991), *aff'd without opinion*

953 F.2d 637 (4th Cir.1992), the court refused to allow damages for the unexecuted portion of a repudiated five year service contract on the ground that allowing such damages would compensate the party for lost profits. *Id.* A similar outcome occurred in *FDIC v. Cobblestone Corp.,* 1992 WL 333961 (D.Mass. Oct. 28, 1992), when the FDIC repudiated a loan to an equipment leasing company seeking to use the proceeds to buy more equipment. The court held that although the repudiation had negatively affected value of the equipment leasing company, the diminution was the result of lost opportunities to purchase new equipment rather than an actual economic loss. *Id.* at *3.

Defendants contend that Citibank is likewise attempting to recoup lost profits by seeking compensation for the decrement in its net revenues. The Court disagrees. Recognizing that the case law under FIRREA is limited, the Court finds sufficient support to distinguish this case from those involving lost future opportunities. *Gertner v. FDIC,* 91–10129 (D.Mass. Oct. 7, 1991), is instructive on this point.

In *Gertner,* the parties had prepared a mortgage agreement which was to have been signed fifteen days after the bank was declared insolvent. After repudiation, the plaintiffs sought alternate financing and sued the receiver to recover the difference. The court refused the claim because the plaintiffs did not claim to have invested money prior to repudiation. *Id.* at 6–7. Unlike the *Gertner* plaintiffs, Citibank claims to have invested money in the provision at issue prior to repudiation. Citibank bargained for and purports to have paid a substantial premium to secure the non-compete provision when it entered into the Agreement with the BNE Banks.

Defendants attempt to transform Citibank's claim into one for lost profits by analyzing the valuation methods Citibank seeks to employ.[10] Citibank characterizes the "eco-

---

9. Conversely, because FDIC regulations allow financial institutions to report credit card relationships as capital assets, repudiation of a covenant by the FDIC without compensation could force the purchaser of credit card assets into receivership. *See* Federal Deposit Insurance Corporation, Capital Maintenance, 58 Fed.Reg. 6363,

Jan. 28, 1993 (Final Draft) (to be codified at 12 C.F.R. Part 325).

10. Citibank proposes three methods to value the non-compete provision. The "economic approach" calculates the difference between the

nomic approach" as a valuation method that calculates the value of the non-compete provision by discounting the "present value of the net projected income stream derived from ownership of the assets." Defendants emphasize the phrase "income stream" and pronounce plaintiff's claim as one for lost profits. The Court disagrees with this interpretation. Citibank does not seek to calculate the potential profitability of the Agreement with the non-compete provision intact. Citibank simply utilizes the "economic approach" to value an intangible asset. *See Citizens & Southern Corp. v. C.I.R.*, 91 T.C. 463, 498, 1988 WL 90987 (1988) (noting that discounted future income stream method is one of three common approaches to asset valuation), *aff'd* 900 F.2d 266 (11th Cir.1990). Mere use of the words "income" or "profit" does not transform a test of value paid into a measure of potential profitability.[11]

In a related argument, defendants assert that Citibank's claim, which seeks return for the value conferred on a breaching party, is a claim for restitution. Defendants argue that restitution is distinct from damages because restitution claims seek to refund the purchase price or return the status quo. As this Circuit recently held:

> [the Supreme court] distinguish[es] between 'damages' which are 'sums of money used as compensatory relief' and 'specific remedies' which are not substitute remedies at all, but attempt to give the plaintiff the very thing to which he was entitled.

*Hubbard v. EPA*, 982 F.2d 531, 536 (D.C.Cir. 1992) (citing *Bowen v. Massachusetts*, 487 U.S. 879, 108 S.Ct. 2722, 101 L.Ed.2d 749 (1988)).

Although the theory of restitution is distinct from damages, this dichotomy does not preclude Citibank's claim. Citibank does not seek the value of performance denied; the loss to Citibank caused by Fleet's solicitation of old BNE customers is too speculative. Instead, Citibank seeks the present value of the amount it paid for the non-compete provision which the FDIC later repudiated. As in the case of any intangible asset, appraisal may involve calculating the difference in value between the performance promised and the performance received.[12] *See Security Development Co. v. Fedco, Inc.*, 23 Utah 2d 306, 462 P.2d 706, 710 (1969) (accepting above measure and holding that cost of sales lost by breach of non-compete provision was too speculative).

### D. Valuation of a Non–Compete Provision

Finally, defendants contend that the non-compete provision is not a valuable asset. No FIRREA case has addressed whether banking law considers non-compete provisions to be valuable assets. However, in considering this issue, the Court finds provisions of bankruptcy law instructive. *See Unisys Finance Corp. v. R.T.C.*, 979 F.2d 609, 611 (7th Cir.1992) (finding bankruptcy analogy instructive because receivership provisions of federal banking law, 12 U.S.C. § 1821(c)–(r), create regime paralleling bankruptcy law). Under bankruptcy law, courts have found non-compete provisions to be valuable contract rights. *See, e.g., Silk Plants Franchise Sys., Inc. v. Register (In re Register)*, 100 B.R. 360, 363 (M.D.Tenn.1989) (courts may award damages for covenants

---

business value of the entity with the provision in place and compares it to the value of the entity without the provision (i.e. with competition). The "market approach" attempts to determine the value of the provision as a portion of the purchase price. Citibank discussed the "cost approach" but did not use it in its calculations.

**11.** The Court notes that the FDIC itself uses the income stream method to value intangible bank assets. FDIC Capital Maintenance (final draft). *See also* 57 Fed.Reg. 11,005 (proposed Apr. 1, 1992).

**12.** There is a fundamental difference between the present value of the amount Citibank paid for the

non-compete provision and the specific remedies the *Bowen* Court ruled were not damages. In *Bowen*, the Supreme Court distinguished between monetary compensation for injury and an equitable action for specific relief. 487 U.S. at 893, 108 S.Ct. at 2731. Citibank seeks a return of what it paid for the repudiated non-compete provision, not the amount it lost through increased competition. "Were the [C]ourt to accept the argument that a monetary reward is restitutionary simply because it returns a party to pre-injury status, little would be left in the realm of compensatory damages." *In re Acushnet River & New Bedford Harbor*, 712 F.Supp. 994, 1002 (D.Mass.1989).

not to compete in bankruptcy cases if amount can be calculated). Similarly, Treasury Regulation § 1.167(a)–3 allows consideration genuinely paid for a covenant not to compete to form the cost basis of a fixed-life, depreciable, intangible asset. *See Patterson v. Commissioner,* 810 F.2d 562, 569 (6th Cir.1987).

Furthermore, it appears that the FDIC believes that banks can readily calculate the value of a bank's credit card business. Recently, the FDIC adopted regulations to recognize credit card customer businesses, including non-compete provisions, as assets for regulatory capital purposes. FDIC Capital Maintenance, 58 Fed.Reg. 6363 (January 28, 1993) (final draft) (to be codified at 12 CFR Part 325). It is difficult for the Court to accept that the FDIC is capable of appraising these assets in its capacity as regulator, but not in its capacity as receiver.

The FDIC also claims that the non-compete provision at issue had no value because Citibank did not allocate a portion to the purchase price to the provision. While Citibank's failure to allocate a value may weaken Citibank's ability to prove that the provision was worth a specific amount, the Court does not believe this failure precludes recovery entirely. If Citibank had allocated a portion of the price to the non-compete provision, the Court could have disregarded the value had the evidence indicated the sum was inaccurate. *See Commissioner v. Danielson,* 378 F.2d 771, 775 (3rd Cir.), *cert. denied,* 389 U.S. 858, 88 S.Ct. 94, 19 L.Ed.2d 123 (1967) (discussing when for tax purposes it is appropriate for the Court to question the value assigned by parties to a non-compete provision). Conversely, the Court does not find that the non-compete provision is without value simply because Citibank did not list it as a separate asset on its books.

Citibank has proposed three valuation methods which are generally accepted in appraising intangible assets. *See* Smith & Parr, *Valuation of Intellectual Property and Intangible Assets,* (John Wiley & Sons, Inc., 1989) at 133. In fact, the FDIC's Capital Maintenance Final Rule advises banks to calculate the value of credit card relationships through "the present value of expected net cash flows that will be generated from future transactions involving the acquired credit card relationships." At this time, the Court refuses to rule as a matter of law that these valuation methods violate § 1821(e). An issue of fact remains as to whether the plaintiffs can prove the amount of damages claimed.

## III. CONCLUSION

For the reasons stated above, the Court concludes that the FDIC can be held liable for damages caused by repudiating an operational non-compete provision for which consideration was paid.

Therefore, defendants' partial motion for summary judgment is denied, and plaintiff's motion for partial summary judgment is granted. An Order in accordance with this Opinion has been filed.