The **RESOLUTION TRUST CORPORA-TION,** as Receiver for Germantown Trust Savings Bank, Plaintiff–Appellee,

v.

**CHESHIRE MANAGEMENT COMPANY, INC.,** Defendant–Appellant.

No. 92–6171.

United States Court of Appeals, Sixth Circuit.

Argued Sept. 23, 1993.

Decided Feb. 8, 1994.

Robert E. Craddock (briefed), Memphis, TN, William E. Long, Jr. (briefed), Walt, Dyer & James, Nashville, TN, P. Matthew Sutko (argued), Washington, DC, for plaintiff-appellee.

Gregory G. Fletcher (argued & briefed), Heiskell, Donelson, Bearman, Adams, Williams & Kirsch, Memphis, TN, for defendant-appellant.

Before: KEITH, GUY, and
BATCHELDER, Circuit Judges.

ORDER AMENDING AND
CORRECTING
OPINION

On December 10, 1993, an opinion designated for publication was filed in this matter. Subsequent to the filing of this opinion, the Resolution Trust Corporation has called the court's attention to two errors in its opinion. Upon review, and after securing a response from the defendant, the court agrees that the changes urged by the Resolution Trust Corporation should be made and, accordingly, the court amends its opinion as follows: [Editors Note: Amendments incorporated into published opinion.]

AMENDED OPINION

RALPH B. GUY, Jr., Circuit Judge.

Defendant, the Cheshire Management Company (Cheshire), appeals an interlocutory order declaring invalid a judgment lien it held on assets in the possession of the Resolution Trust Corporation (RTC) as receiver for a savings bank. On appeal, Cheshire contends that it is entitled to full payment of its judgment because Cheshire possesses a valid judgment lien enforceable against RTC. Alternatively, Cheshire argues that it holds a judgment on a qualified financial contract that RTC may not avoid pursuant to the Financial Institutions Reform, Recovery and Enforcement Act of 1989 (FIRREA). We affirm.

I.

The relevant facts in this action are undisputed. In 1986, Cheshire entered into an agreement with Germantown Trust Savings Bank (Germantown Trust) entitled "Option Contract, Put Agreement and Right of First Refusal." This contract was part of a loan restructuring transaction whereby Cheshire, the general partner of the borrower, injected approximately $1.4 million of new capital into a Houston apartment complex on which Germantown Trust held a mortgage. This capital came from the sale of certain mortgages by Cheshire to Germantown Trust. Cheshire and its partners had given serious consideration to permitting foreclosure of the property, which would have caused Germantown Trust to lose a significant part of the capital it had loaned on the property. Thus, Germantown Trust was anxious to negotiate a restructuring of the loan agreement. In return for Cheshire's injection of capital, Germantown Trust gave Cheshire an option during the period of May 31, 1986, through May 1, 1988, to purchase 6,000 shares of Germantown Trust stock at $100 per share. Cheshire also had the right to sell its option back to Germantown Trust on May 1, 1988, for $300,000. To ensure that the contract had adequate consideration, the parties agreed that Germantown Trust would hold a right of first refusal on future "end loans" negotiated by Cheshire.

On May 1, 1988, Cheshire attempted to exercise its right to sell its option to Germantown Trust. The bank refused to honor the option, asserting that Cheshire had breached the contract by failing to fulfill its obligations with regard to Germantown Trust's right of first refusal as to certain end loans. Cheshire then filed suit in state court to enforce the contract.

Later, in March of 1989, the Federal Home Loan Bank Board (FHLBB) appointed the Federal Savings & Loan Insurance Corporation (FSLIC) as conservator for Germantown Trust. This action by the FHLBB was recorded in the Shelby County, Tennessee, register's office on March 14, 1989. In August of that year, RTC succeeded the FSLIC as conservator for Germantown Trust pursuant to the newly-enacted FIRREA. Likewise, the Office of Thrift Supervision (OTS) succeeded the FHLBB pursuant to FIRREA. As conservator of Germantown Trust, RTC substituted itself for Germantown Trust as defendant in Cheshire's breach of contract action. The case was then removed to federal district court.

On January 17, 1990, the district court entered judgment for Cheshire in the amount of $300,000, plus interest, attorney fees, and

expenses. RTC appealed the district court's judgment. During the pendency of the appeal, the OTS moved RTC from its position as conservator for Germantown Trust to the position of receiver for the bank. This change occurred on May 17, 1990. The next day, RTC sold certain assets of Germantown Trust to the National Bank of Commerce at Memphis. Cheshire complains that it received no notice of that sale. Five days later, on May 22, RTC published an announcement in *The Commercial Appeal* stating that it had been appointed as receiver for Germantown Trust. This announcement was also published in the paper on June 20 and July 20, 1990. On May 24, 1990, Cheshire recorded the district court's judgment against RTC in the Shelby County register's office. In April of 1991, this court affirmed the decision of the trial court.

RTC then filed the present three-count complaint against Cheshire, seeking a mandatory injunction requiring Cheshire to release its judgment lien, a judgment declaring Cheshire's lien invalid under FIRREA, and damages for slander of RTC's title. The parties entered into a consent order in which RTC agreed to deposit into escrow a cash sum representing Cheshire's judgment. In return, Cheshire released its judgment lien, rendering RTC's first claim nugatory. The agreement between the parties included a provision that the money in escrow would pass to either RTC or Cheshire in accord with the court's ruling.

Both parties moved for summary judgment on the issue of whether RTC was entitled to a judgment declaring Cheshire's lien invalid. Cheshire argued that it had registered its judgment properly and RTC must abide by it.[1] Alternatively, Cheshire maintained that it held a perfected security interest or a judgment on a qualified financial contract (QFC) that RTC could not avoid. RTC did not dispute its liability for the judgment. Instead, it argued that Cheshire's failure to record its judgment until after RTC's appointment as receiver left Cheshire as an unsecured creditor entitled to no more than its *pro rata* share of the receivership's assets. Moreover, RTC maintained that Cheshire possessed a judgment rather than a QFC and therefore the FIRREA's requirements for QFCs did not apply to this situation. The district court agreed with RTC on both of its arguments, and granted summary judgment to RTC on the question of the lien's validity. Although the court's ruling did not resolve all of RTC's claims against Cheshire, the court certified its judgment on count two of RTC's complaint as a final judgment under Federal Rule of Civil Procedure 54(b), because the legal issues associated with that count controlled the rest of the case.

## II.

FIRREA is comprehensive federal legislation intended to improve the financial condition of the savings and loan industry, and to dispose of the assets of hundreds of insolvent savings and loan institutions whose deposits were insured by the FSLIC. The Act transfers thrift regulatory and chartering functions from the FHLBB to the OTS; transfers the insurance function of the FSLIC to the Federal Deposit Insurance Corporation (FDIC); and transfers responsibility for liquidation and disposition of the assets of failed thrift institutions from the FSLIC to RTC, a wholly-owned government corporation directed by a five-member board and chaired by the Secretary of the Treasury.

Under the Act, the RTC is granted all resolution powers and activities authorized to be exercised by the FDIC and former FSLIC, including, but not limited to, conservatorship and receivership powers conferred upon the FDIC. 12 U.S.C. § 1441a(b). RTC is authorized to borrow from the United States Treasury for resolution purposes. 12 U.S.C. § 1441a(i). As conservator, the RTC has the authority to conduct the business of an insured thrift, including taking deposits and performing all functions of the financial institution in its own name, and to take other actions as may be necessary to put the institution in a sound and solvent condition. 12 U.S.C. § 1821(d)(2)(D). As receiver, RTC has the authority to liquidate the assets and pay the obligations of the insured institution on behalf of the depositors and creditors; to

---

1. At oral argument counsel for Cheshire, for all practical purposes, abandoned this argument.

merge the institution with another insured financial institution; to organize a federal savings association to take over the assets and liabilities from a failed thrift; or to organize a bridge bank or a new national bank to take over assets and liabilities of any insured bank in default. 12 U.S.C. § 1821(d)(2)(E), (F) and (G).

At issue in this case is whether the judgment Cheshire obtained in federal court prior to RTC's arrival as receiver for Germantown Trust is enforceable against the RTC, although Cheshire did not record its judgment until after RTC became receiver. In addition, we must consider the applicability, if any, of FIRREA's provisions for QFCs to this case.

### III.

Under Tennessee law, the proper registration of a judgment creates a lien that entitles the judgment creditor to priority over subsequent judgment liens and security interests. Tenn.Code Ann. § 25–5–101(b). Cheshire contends initially that it properly registered its judgment and nothing in FIRREA prevented it from doing so; thus, according to Cheshire, its registered judgment created a secured interest that the RTC could not avoid. A close examination of the applicable statutory provisions disproves Cheshire's theory.

■ In §§ 1821(i)(1) and (2) of the Act, Congress prohibited any general (or, "unsecured") creditor from receiving more than its *pro rata* share of receivership assets. The "maximum" amount a claimant may receive is the amount of receivership assets it would have obtained if the institution had been liquidated. *See* 12 U.S.C. § 1821(i)(2); *see also Texas American Bancshares, Inc. v. Clarke,* 954 F.2d 329, 340 (5th Cir.1992) (under § 1821(i), the FDIC "not compelled to pay a creditor more than the *pro rata* share it would have received if the FDIC had liquidated the bank"). In making payments under this framework, FIRREA's regulations establish 10 categories of unsecured creditors whereby each class of creditor is paid in descending order from category 1 through 10 before any subsequent class of creditor receives any payment. 12 C.F.R. § 360.2(a).

Cheshire attempted to escape this payment hierarchy by "securing" its judgment against the RTC. Cheshire recorded its judgment in the Shelby County, Tennessee, register's office in the hope of creating a legally enforceable or perfected security interest pursuant to § 1821(e)(11), which states:

No provision of this subsection shall be construed as permitting the avoidance of any legally enforceable or perfected security interest in any of the assets of any depository institution except where such an interest is taken in contemplation of the institution's insolvency or with the intent to hinder, delay, or defraud the institution or the creditors of such institution.

■ We need not answer whether Cheshire's recording of its judgment would have been effective prior to RTC's accession to the position of receiver, for we agree with the district court that RTC's elevation to receiver in possession of Germantown Trust's assets seven days before Cheshire recorded its judgment made Cheshire's action ineffective. Section 1821(d)(13)(C) of FIRREA provides that "[n]o attachment or execution may issue by any court upon assets in the possession of the receiver." This provision bars Cheshire from registering its judgment against RTC, for it prevents the encumbrance of property owned by the RTC as receiver. *See GWN Petroleum Corp. v. OK–Tex Oil & Gas, Inc.,* 998 F.2d 853, 857 (10th Cir.1993) (§§ 1821(d)(13)(C) and 1825(b)(2) prohibit any "ancillary remedy in aid of execution to obtain payment of a judgment"); *cf. United States v. FDIC,* 881 F.2d 207 (5th Cir.1989), *cert. denied,* 493 U.S. 1072, 110 S.Ct. 1118, 107 L.Ed.2d 1025 (1990). As the district court noted correctly, a judgment lien interferes with the receiver's ability to dispose of assets in much the same manner as an attachment or execution. To allow a creditor to do so would frustrate Congress's purpose in enacting § 1821(d)(13)(C), which is to preclude post-receivership improvement of position.

■ Cheshire contends that § 1821(d)(13)(C) is not controlling because it does not speak specifically of judgment liens, and instead addresses only "attachments"

and "executions." We reject this argument. We will not demand that Congress catalog each and every device available in the 50 states for securing judgment interests. The framework that Congress established for the RTC is clear. Once the RTC positions itself as the receiver of a bank's assets, unsecured creditors who have not yet received a final unappealable judgment against the RTC may not elevate themselves to the position of secured creditors through the filing of a judgment lien on trial court victories that have been appealed. *See Hill v. Imperial Savs.*, No. A–91–CA–780, 1992 WL 601888 (W.D.Tex. Nov. 24, 1992); *RTC v. Clarke*, 812 F.Supp. 48, 53–54 (E.D.Pa.1992).

■ Cheshire also argues that even if § 1821(d)(13)(C) applies generally to this situation, it is inapplicable here because RTC failed to notify Cheshire of its change of positions and therefore did not take possession as receiver of Germantown Trust's assets until after Cheshire recorded its lien. We do not understand possession by the RTC under § 1821(d)(13)(C) to be contingent upon giving notice to creditors. To be sure, FIRREA provides in certain circumstances that creditors receive notice of the RTC's activity as a conservator or receiver. *See, e.g.,* 12 U.S.C. § 1821(e)(10) (requiring that the conservator or receiver make its "best efforts" to notify the holder of a QFC within one "business day" of any transfer of the QFC). Nowhere in the statute, however, is there a requirement that the RTC record its status as receiver or notify creditors of its position. Indeed, the relevant implementing regulations provide that the RTC as receiver succeeds to the bank's assets "[b]y operation of law ... without any conveyance or other instrument, act or deed." 12 C.F.R. § 580.-2(7); *see also* 12 U.S.C. § 1821(d)(2)(A).

## IV.

Next, Cheshire argues that its contract with Germantown Trust constituted a qualified financial contract, and FIRREA requires that the RTC not avoid payment on such a contract. The district court concluded that whether the contract itself constituted a QFC mattered not, for Cheshire no longer possessed a contract but rather held a judgment.

Thus, the court found the FIRREA's alleged requirements inapplicable. We take a somewhat different course than did the trial court, necessitating a brief review of FIRREA's treatment of QFCs.

■ In subsection (e) of § 1821 of the Act, Congress explained how to treat contracts entered into prior to the RTC's appointment as conservator or receiver. In general, the Act grants to the RTC as receiver or conservator the power to "disaffirm or repudiate" any contract or lease that the receiver or conservator determines to be "burdensome" or inconsistent with promoting "the orderly administration of the institution's affairs." 12 U.S.C. § 1821(e)(1)(B) & (C); *see also Atlantic Mechanical, Inc. v. RTC*, 772 F.Supp. 288, 291 (E.D.Va.1991), *aff'd*, 953 F.2d 637 (4th Cir.1992). When repudiation or disaffirmance occurs, the damages to the holder of the contract are limited to "actual, direct compensatory damages" measured as of the date of the appointment of the conservator or receiver. 12 U.S.C. § 1821(e)(3). Damages do not include punitive or exemplary damages, lost profits or opportunity, or pain and suffering. *Id.* The RTC as receiver also generally has the power selectively to transfer any asset or liability of a failed institution "without any approval, assignment, or consent with respect to such a transfer." 12 U.S.C. § 1821(d)(2)(G)(i)(II). In addition, RTC as conservator or receiver generally may enforce any contract "notwithstanding any provision of the contract providing for termination, default, acceleration, or exercise of rights upon, or solely by reason of, insolvency or the appointment of a conservator or receiver." 12 U.S.C. § 1821(e)(12)(A). Further, the receiver or conservator may avoid certain preferential or fraudulent transfers. 12 U.S.C. § 1821(d)(17). Thus, the RTC has broad authority to operate institutions in a way that will place them on firm ground as quickly as possible. *Atlantic Mechanical*, 772 F.Supp. at 291.

A few exceptions to this broad power exist in the RTC's treatment of QFCs. Unlike the general rule allowing the RTC as receiver to enforce contracts notwithstanding any clause in the contract providing otherwise, Congress

provided that counterparties to QFCs may terminate or accelerate under the terms of the contract upon insolvency or upon the appointment of the RTC as receiver. 12 U.S.C. § 1821(e)(8)(A). Qualified financial contracts held by the conservator remain subject to the general rule of § 1821(e)(12). This difference results from the fact that when the RTC handles an institution as a conservator, it continues to operate the bank as a going concern and hence pays obligations under contract when due and in cash. This is in contrast to its receivership role which is aimed at liquidating the institution. *RTC v. CedarMinn Bldg. Ltd. Partnership,* 956 F.2d 1446, 1454 (8th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 94, 121 L.Ed.2d 56 (1992). Allowing the holder of a QFC to terminate the contract at that point would jeopardize the conservator's ability to maintain the institution.

 A second difference between the treatment of contracts generally and QFCs is that Congress established a specific procedure for the transfer of QFCs between receivers, conservators, and acquirers. *See* 12 U.S.C. § 1821(e)(9). This transfer is an "all or nothing" proposition. The RTC must either transfer to another institution all of the QFCs that exist between the failing bank and a particular entity or none of them. This requirement exists so that the QFCs are not dispersed among several banks, allowing the holder of the QFC to preserve its ability to "set off" its liabilities to the failed bank against its assets. *See* H.R.Rep. No. 101–54(I), 101st Cong., 1st Sess., *reprinted in* 1989 U.S.Code Cong. & Admin.News. 86, 127–28 ("The receiver may transfer all claims of a party and its affiliates against the financial institution, all claims of the institution under such contracts, and all assets securing claims under such contracts, thus preserving all netting (if applicable) and setoff rights to security.").

 In defining the damages that a holder of a QFC may recover when the RTC repudiates or dissaffirms the contract, Congress established a third difference between the treatment afforded QFCs and other contracts. Rather than computing damages at the date of the appointment of the conservator or receiver, the Act provides for computation of damages on QFCs on the date of the disaffirmance or repudiation of the contract. 12 U.S.C. § 1821(e)(3)(A)(ii)(II). In addition, compensatory damages for holders of QFCs include the "normal and reasonable costs of cover or other reasonable measures of damages utilized in the industries." 12 U.S.C. § 1821(e)(3)(C)(i). Thus, QFCs are more expensive for the RTC to repudiate or disaffirm than regular contracts.

Qualified financial contracts are defined in the Act as any securities contract, commodity contract, forward contract, repurchase agreement, or swap agreement. 12 U.S.C. § 1821(e)(8)(D)(i). In addition, FIRREA further defines a "securities contract" by incorporating the definition contained in the Bankruptcy Code, *see* 12 U.S.C. § 1821(e)(8)(D)(ii), which defines such a contract as one "for the purchase, sale, or loan of a security, including an option for the purchase or sale of a security...." 11 U.S.C. § 741(7). We need not resolve whether Cheshire currently is a party to a QFC, as did the trial court, for we conclude that even if Cheshire had entered into a QFC with Germantown Trust it would not change Cheshire's status as an unsecured creditor.

 We now reach § 1821(e)(8)(C), the proper reading of which is central to the parties' dispute. Section 1821(e)(8)(C) provides:

**(C) Certain transfers not avoidable**

**(i) In general**

Notwithstanding paragraph (11), the Corporation, whether acting as such or as conservator or receiver of an insured depository institution, may not avoid any transfer of money or other property in connection with any qualified financial contract with an insured depository institution.

**(ii) Exception for certain transfers**

Clause (i) shall not apply to any transfer of money or other property in connection with any qualified financial contract with an insured depository institution if the Corporation determines that the transferee had actual intent to hinder, delay, or defraud such institution,

the creditors of such institution, or any conservator or receiver appointed for such institution.

Cheshire argues that the RTC is doing that which the statute prohibits specifically. According to Cheshire, the RTC is avoiding a transfer of money in connection with Cheshire's qualified financial contract with Germantown Trust. Cheshire's rather sweeping interpretation of § 1821(e)(8)(C)—which would transform all unsecured creditors in possession of QFCs into secured creditors—is unpersuasive.

The plain meaning of the section is to sanction payments made or collateral transferred by a banking institution prior to its insolvency, provided that the payment is made to the holder of a QFC who has not acted to defraud or delay the institution. Otherwise, the RTC would have the authority to recover pre-intervention transfers of money or property to holders of QFCs, because it has just such a right with regard to other pre-insolvency transfers. *See* 12 U.S.C. § 91 (prohibiting transfers "made after the commission of an act of insolvency, or in contemplation thereof, made with a view to prevent the application of its assets in the manner prescribed by this chapter, or with a view to the preference of one creditor to another").

Had Congress intended to require the RTC to treat all QFCs as secured claims, it could have done so expressly. Congress demonstrated that it knew how to give such priority to creditors' claims. For example, in § 1821(e)(7)(B) of the Act, certain payments owing under repudiated service contracts are treated as administrative expenses of the conservatorship or receivership. Pursuant to the priority regulations of 12 C.F.R. § 360.2, administrative expenses are entitled to first priority and paid fully by the estate of the receiver.

Cheshire fails to support its interpretation of the statute with any legislative history or any other evidence that Congress sought to elevate all holders of QFCs to the status of secured creditors. Absent such evidence, we are persuaded that § 1821(e)(8)(C) applies only to transfers of assets by an institution prior to insolvency.

**AFFIRMED.**