NEW HAMPSHIRE ASSOCIATES
LIMITED PARTNERSHIP

v.

FEDERAL DEPOSIT INSURANCE CORPORATION, successor to Resolution Trust Corp., as Receiver for Potomac Federal Savings Bank.

Civil Action No. CCB–95–2144.

United States District Court,
D. Maryland.

Sept. 23, 1997.

Cynthia L. Leppert, Hugh M. Bernstein, Neuberger, Quinn, Gielen, Rubin & Gibbler, P.A., Baltimore, MD, for Plaintiff.

Anne Kelly Laynor, Rosenberg Proutt Funk & Greenberg, LLP, Baltimore, MD, for Defendant.

## MEMORANDUM

BLAKE, District Judge.

Now pending are cross-motions for summary judgment in this action alleging breach of a real property lease contract. The defendant claims that it properly disaffirmed the lease under the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA"), Pub.L. No. 101–73, 103 Stat. 183 (codified in scattered sections of Titles 12 and 18 U.S.C.). No hearing is deemed necessary. *See* Local Rule 105.6. For the reasons that follow, the defendant's motion will be granted, in part, on the issue of disaffirmance of the lease, and the plaintiff's motion will be granted on the issue of pre-disaffirmance rent due.

## BACKGROUND

The plaintiff is New Hampshire Associates Limited Partnership ("New Hampshire"), a Maryland Limited Partnership with its principal place of business in Montgomery County, Maryland. By a writing dated March 27, 1987, New Hampshire leased office space in Silver Spring, Maryland to the Potomac Savings Bank, F.S.B. ("Bank") for a term of fifteen years, which was to expire on June 30, 2002. The rent consisted of a base monthly rent of $29,647.13 (subject to annual increases) plus additional pass-throughs for common area maintenance and real estate taxes. The Bank operated an administrative office on the premises, and subleased part of the office space to sub-tenants.

The Bank was later declared insolvent, and through a chain of events (the precise detail of which is neither disputed nor pertinent to the issues raised in this case) the defendant Resolution Trust Corporation ("RTC"), a corporate instrumentality of the United States, was appointed receiver of the Bank effective

February 25, 1994. Although the RTC was later statutorily succeeded by the Federal Deposit Insurance Corporation ("FDIC"), effective December 31, 1995, 12 U.S.C. § 1441a(m)(1) (providing for both termination of the RTC and its succession by the FDIC), the RTC was the receiver for the Bank during the events here at issue.[1] Thus, even though the FDIC is the party in interest in this litigation, for simplicity the defendant will be referred in this opinion simply as the RTC.

Ninety days after its appointment as receiver, the RTC attempted to disaffirm the lease by letter dated May 26, 1994. The letter was addressed, however, not to New Hampshire, but to its general partner, Marvin R. Lang. It stated that the RTC, as receiver for the Bank, had the power under 12 U.S.C. § 1821(e) to disaffirm any contract entered into by the Bank prior to the RTC's appointment. It then purported to disaffirm the lease:

> The [Bank's] records indicate that the [Bank] was a party to that [sic] certain lease dated *March 27, 1987,* and any subsequent amendments, if any, between you and the [Bank] The purpose of this letter is to notify you that the Receiver has elected to disaffirm this lease to the full extent, if any, that the represented and enforceable obligation of the [Bank] effective as of *July 31, 1994* [sic]. You are entitled to contractual rent through the effective date. You do not have a claim for damages under any acceleration or penalty clause. Further, the Receiver is entitled to any collateral pledged to secure the [Bank's] remaining obligations.
>
> All creditors having claims against the [Bank] must present their claims, substantiated by legal proof, to the Receiver by *August 24, 1994* (90 days from *May 26, 1994* ).

On August 23, 1994, New Hampshire submitted a claim to the RTC for $1,948,442.48 in "[l]ost rent and operating expense payments ... due to breach/alleged disaffirmance of the Lease." (Pl.'s Compl., Ex. C.)

Attached was a statement that New Hampshire was never officially notified that the lease was being disaffirmed, and thus the RTC had failed to comply with the repudiation requirements of 12 U.S.C. § 1821(e). The RTC disallowed the claim in full and New Hampshire timely filed this suit.

## ANALYSIS

### 1. *Standard for Summary Judgment*

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment

> shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

The Supreme Court has clarified that this does not mean any factual dispute will defeat the motion:

> By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986) (emphasis in original).

"The party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of [its] pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Rivanna Trawlers Unlimited v. Thompson Trawlers, Inc.,* 840 F.2d 236, 240 (4th Cir.1988). The court must "view the facts and draw reasonable inferences in a light most favorable to the nonmoving party," *Shaw v. Stroud,* 13 F.3d 791, 798 (4th Cir. 1994), but it also must abide by its affirmative obligation to ensure that factually unsupported claims and defenses do not proceed to trial. *Felty v. Graves–Humphreys Co.,* 818

---

1. The RTC's powers as receiver of a failed insured depository institution were generally coextensive with those of the FDIC when acting in the same capacity. 12 U.S.C. § 1441a(b)(1)(B), (b)(4)(A), (b)(5).

F.2d 1126, 1128 (4th Cir.1987) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986)).

### 2. *"Reasonable Period"*

FIRREA was enacted in 1989 to address the dire financial circumstances of the numerous failed, federally insured, savings and loans throughout the country at that time. It " 'constitute[d] emergency legislation' to stop the financial hemorrhaging" of government coffers brought on by the savings and loan crisis. *Resolution Trust Corp. v. Diamond*, 18 F.3d 111, 113 (2d Cir.) (quoting S.Rep. No. 101–19, at 3 (1989)) (alteration in original), *vacated sub nom. Solomon v. Resolution Trust Corp.*, 513 U.S. 801, 115 S.Ct. 43, 130 L.Ed.2d 5 (1994); *aff'd in part, rev'd in part on other grounds*, 45 F.3d 665, *cert. denied*, 515 U.S. 1158, 115 S.Ct. 2609, 132 L.Ed.2d 853 (1995); *see also Plymouth Mills, Inc. v. F.D.I.C.*, 876 F.Supp. 439, 440 (E.D.N.Y.1995) (citing H.R.Rep. No. 101–54(I), at 291–312 (1989), *reprinted in* 1989 U.S.C.C.A.N. 86, 87–108 (reviewing history of savings and loan industry and purposes and major aspects of the Act)). As the House Report put it: "The interests of the American taxpayer demand an expedited resolution to the monumental problems involved with the unprecedented costs of dealing with hundreds of insolvent thrifts and the orderly disposition of the assets of these failed institutions." H.R.Rep. No. 101–54(I), at 308, 1989 U.S.C.C.A.N. at 104.

■ While federally insured· banks and savings and loan associations are not subject to bankruptcy law, 11 U.S.C. § 109(b)(2), the receivership provisions of 12 U.S.C.A. § 1821 (c)–(r) create a more or less parallel regime for those institutions. *Unisys Finance Corp. v. Resolution Trust Corp.*, 979 F.2d 609, 611 (7th Cir.1992). There is at least one major difference, however. Under bankruptcy law, when the trustee or debtor in possession terminates the unexecuted portion of a lease or contract entered into by the bankrupt, the lessor can claim damages as a general credi-

tor in the bankruptcy proceeding (although a lessor's damages are truncated). 11 U.S.C. § 502(b)(6). By contrast, under FIRREA the lessor's damages claim is completely extinguished except for back rent. 12 U.S.C. § 1821(e)(4). One commentator making the comparison between FIRREA and the Bankruptcy Code observed that the "banking agencies [such as the RTC and FDIC] have essentially the same powers as the trustee, but with two material additions. First, the agencies appear to retain almost unlimited discretion about whether to repudiate, in contrast to the bankruptcy court's supervision of a trustee's decision. [*See* 11 U.S.C. § 365(a).] Second, the agencies need not pay the full measure of contract damages that repudiation in bankruptcy requires; instead, the receiver or conservator is excused from payment for lost profits on contracts and for future rent on leases. [*See* 12 U.S.C. § 1821(e)(3)–(4).]" Peter P. Shire, *Bank Insolvency Law Now That It Matters Again,* 42 Duke L.J. 469, 485–86 (1992); *see also* Carol Anne Senello, Note, *FIRREA's Damage Provisions: Inequitable, Unnecessary, and Costly ·To Boot,* 45 Duke L.J. 183, 184 (1995) ("Whereas the Code aspires to change the relative rights existing at the date of bankruptcy as little as possible, ... FIRREA severely curtails the rights of parties who ... enter[ed] into agreements with financial institutions.").

Congress established the RTC to act as conservator or receiver for failed thrift institutions, 12 U.S.C. § 1441a(b), requiring it to conduct its operations "in a manner which [ ] maximizes the net present value. return from the sale or other disposition of" thrift assets. 12 U.S.C. § 1441a(b)(3)(C)(i). Accordingly, Congress granted to the RTC the authority to disaffirm or repudiate any lease that the bank may have made before receivership if the RTC were to determine, in its discretion, both that the lease was "burdensome" and that disaffirmance would "promote the orderly administration of the institution's affairs." 12 U.S.C. § 1821(e)(1)(B–C).[2]

---

**2.** Although New Hampshire originally claimed that the RTC never in fact made these determinations—the RTC having failed repeatedly in discovery to produce any evidence on the matter—

the RTC eventually managed to produce with its reply brief two interoffice memoranda showing that it did in fact determine that maintaining the lease would be burdensome. (The delay seems

For a disaffirmance or repudiation to be effective, however, the decision to do so must be made within a "reasonable period following [the receiver's] appointment." 12 U.S.C. § 1821(e)(2). Congress did not define what constitutes a reasonable period, but it is instructive that prior versions of the bill set the repudiation period at ninety days. *See* H.R.Rep. No. 101–54(I), at 331, 1989 U.S.C.C.A.N. at 127. The "final statute eliminated the express 90–day restriction, [Congress] apparently concluding that RTC ought to be given some flexibility.... FIRREA's grant of a 'reasonable period' within which to repudiate contracts follows the common law approach." *Resolution Trust Corp. v. Cedar-Minn Bldg. Ltd. Partnership*, 956 F.2d 1446, 1455 n. 13 (8th Cir.1992).

Although reasonableness is to be determined on the facts of each case, *see Union Bank v. Federal Savings and Loan Ins. Corp.*, 724 F.Supp. 468, 471 (E.D.Ky.1989) (citing Congress' decision not to set a specific time period for repudiation), a number of courts have held on summary judgment that periods of ninety days or more were reasonable, at least absent evidence of bad faith by the RTC, or prejudice to the lessor. *See 1185 Ave. of the Americas Assoc. v. Resolution Trust Corp.*, 22 F.3d 494, 498 (2d Cir. 1994) (90 days reasonable where RTC had given 90 day option to acquiring institutions to assume leases); *Franklin Financial v. Resolution Trust Corp.*, 53 F.3d 268, 272 (9th Cir.1995) (117–day period reasonable, especially where RTC after 59 days announced its intention to repudiate if acquiring institution did not exercise option to assume lease; finding that "in this case the RTC's obligation in resolving the financial affairs of failed financial institutions outweighs the expectations of the landlord"); *Monument Square Assoc. v. Resolution Trust Corp.*, 792 F.Supp. 874, 879 (D.Mass.1991) (three and a half months reasonable where plaintiff neither alleged that RTC acted in bad faith nor pointed to cir-

cumstances indicating it acted unreasonably). *See also CedarMinn*, 956 F.2d at 1455–56 and n. 14 (noting in dicta that even fourteen-month delay could have been reasonable where lessor could show no prejudice as result of RTC's attempts to renegotiate leases which lessor admitted no other business wanted to take on); *Resolution Trust Corp. v. United Trust Fund, Inc.*, 57 F.3d 1025, 1034 (11th Cir.1995) (although noting that neither party on appeal argued that three-month and three-week period was unreasonable, "conclud[ing] that such a period was reasonable in this case"). On the other hand, *Plymouth Mills* refused to grant summary judgment on a record similar to this one, observing that "the FDIC has not indisputably established that an earlier formal notice of disaffirmance of the lease would have been unfeasible." 876 F.Supp. at 445. It appears, however, that in drawing a strong analogy to judicial interpretation of the concept of a "reasonable period" in bankruptcy law, the court may not have given appropriate weight to the substantially greater powers granted to the RTC under FIRREA. *See id.* at 442–44.

The RTC did not initially repudiate the lease when it became receiver, even though the institution to which it had sold the assets of the Bank had waived its option to assume the lease, "so that the Administrative functions and responsibilities relative to the operation of Potomac Federal could continue in an uninterrupted and efficient manner." (Def.'s Mem. Opp. Summ. J. and Reply, Leg. Div. Interoff. Mem., Ex. 2, at 3.) A ninety-day period for winding up the business of the failed Bank seems reasonable enough on its face, and New Hampshire neither argues to the contrary nor claims bad faith on the part of the RTC or prejudice to itself. Notably, it has not presented evidence that it was harmed in any way by the ninety-day delay, and does not protest the further two month

to have been due at least in part to the fact that the RTC had been succeeded by the FDIC and files were therefore difficult to locate.) As New Hampshire did not reply to this evidence—and had previously only argued that the determination merely need be made, conceding that "the correctness of the determination is left to the discretion of the RTC," Pl.'s Mem. Opp. and

Supp. Summ. J. at 9—the RTC is entitled to summary judgment on this issue. *See* Fed. R.Civ.P. 56(e) (when motion for summary judgment is made and supported as provided in the rule, the party opposing the motion may not rest upon the pleadings, but must "set forth specific facts showing that there is a genuine issue for trial"); *Rivanna Trawlers*, 840 F.2d at 240.

period between notice of disaffirmance and the RTC's vacating the property. Rather, its entire argument consists in asserting that the RTC has not met its own burden. The RTC's evidentiary support for its motion is admittedly slender; however, given Congress' purpose in enacting the statute, that the RTC's powers as receiver substantially exceed those of a bankruptcy trustee when it comes to disaffirming leases and contracts, that the notice of disaffirmance was given within the period of time Congress originally contemplated before it apparently decided to give the RTC greater flexibility, precedent in other circuits, and New Hampshire's complete failure to produce evidence on or even allege that there exist any countervailing considerations, the court finds that the ninety day period in this case was reasonable as a matter of law.

### 3. *Existence of Subleases*

■ New Hampshire argues that under the FIRREA the RTC had no power to repudiate the lease because it had subleased part of the property to sub-tenants. It bases its argument on 12 U.S.C. § 1821(e)(5)(A), which provides that:

> If the conservator or receiver repudiates an unexpired written lease of real property of the insured depository institution under which the institution is the lessor and the lessee is not, as of the date of such repudiation, in default, the lessee under such lease may either—
>
> (i) treat the lease as terminated by such repudiation; or
>
> (ii) remain in possession of the leasehold interest for the balance of the term of the lease unless the lessee defaults under the terms of the lease after the date of such repudiation.

Because, New Hampshire argues, at the time of the RTC's attempted repudiation the sublessees were neither in default nor had they consented to termination of their leases, the

RTC could not dispossess the sublessees and return possession of the leased premises to New Hampshire.

New Hampshire's argument rests upon the unsupported premise that to repudiate a lease under FIRREA the RTC must return full possession of the leased premises to the lessor. But this premise conflicts with the statute it is supposedly based upon, which on its face serves merely to grant rights to a sublessee who, having had nothing at all to do with the Bank's insolvency, might otherwise be dispossessed and left with only a claim against an insolvent landlord. *Cf. Resolution Trust Corp. v. Diamond,* 45 F.3d 665, 675 (2d Cir.) (analyzing tenant's right to remain under its sublease after RTC's repudiation), *cert. denied sub nom. Solomon v. Resolution Trust Corp.,* 515 U.S. 1158, 115 S.Ct. 2609, 132 L.Ed.2d 853 (1995).[3] Put another way, it allows the sublessee to remain in possession *in spite of* the repudiation. New Hampshire offers no reason to regard the provision otherwise, and it would seem quite strange if the RTC's repudiation, otherwise proper, were to remain valid if the sublessee selects option (i), yet suddenly become invalid because the sublessee selects option (ii). For the rights of the sublessee never arise unless and until the receiver repudiates the lease: the statute unambiguously states that *if* the receiver repudiates, a lessee not in default may *then* choose either to stay or to leave, without repercussion. To say that the sublessee's exercise of its right to remain in possession negates the very condition precedent (repudiation) upon which that right is dependent simply defies all logic.

### 4. *Notice*

■ New Hampshire argues that the RTC's notice of disaffirmance of the lease addressed to its general partner, Mr. Lang, was legally insufficient to constitute notice to

---

**3.** While it seems equally true (except in a highly unusual case) that a lessor would have had no role in the Bank's insolvency, Congress specifically cut off certain of its rights, as discussed previously. It chose to treat sublessees somewhat differently, although in keeping with the policy of minimizing the cost to the government as insurer of failed institutions, a sublessee who chooses to remain in possession has only a limited damages claim against the RTC for its failure subsequent to repudiation to perform its obligations under the sublease. See 12 U.S.C. § 1821(e)(5)(B).

the partnership itself. New Hampshire does not, however, deny that it actually learned of the RTC's attempt to disaffirm, nor does it claim that it was prejudiced in any way by the notice being addressed to Mr. Lang. It does not argue that it could not discern which lease the letter purported to disaffirm. Indeed, in accordance with the RTC's instructions contained in the letter, New Hampshire filed with the RTC a proof of claim within ninety days of RTC's disaffirmance, thus preserving its right to file the present action. See 12 U.S.C. §§ 1821(d)(3)(B–C), 1821(d)(5)(C), 1821(d)(13)(D); *Elmco Properties v. Second Nat. Fed. Sav. Assoc.*, 94 F.3d 914, 919 (4th Cir.1996) ("unless a claim is first presented to the RTC for resolution, no court has jurisdiction over it").

Perhaps realizing that it cannot claim not to have received actual notice of RTC's disaffirmance, New Hampshire instead argues— by some apparently technical yet self-evident proposition, as it cites to no authority in its brief—that notice to its general partner "did not have the effect of disaffirming the ... lease ... between New Hampshire and the Bank." (Pl.'s Compl. at 3.) Under the Maryland Uniform Partnership Act,[4] however, "[n]otice to any partner of any matter relating to partnership affairs, and the knowledge of the partner acting in the particular matter ... operate as notice to or knowledge of the partnership" (except in the case of the partner's fraud on the partnership). Md.Code Ann., Corps. & Ass'ns § 9–304 (Michie 1993 & Supp.1996); *see also id.* § 9–102 (a person has "knowledge" not only when he or she has actual knowledge, but when he or she "has knowledge of such facts as in the circumstances shows bad faith"; and a person has "notice" when the person claiming the benefit of such notice mails "a written statement of the fact to such person or to a proper person at his [or her] place of business or residence"); *id.* § 9–301 (partner is agent of partnership). These sections apply as well to limited partnerships. *See id.* § 10–108 (providing that provisions of Title 9

shall apply to limited partnerships unless inconsistent with or modified by provisions in Title 10); *Mount Vernon Fire Ins. Co. v. East Side Renaissance Assoc.*, 893 F.Supp. 242, 247 (S.D.N.Y.1995) (holding that limited partnership had notice of lead paint law violations where notice was addressed to and received by general partner, interpreting provision identical to Md.Code Ann., Corps. & Ass'ns § 9–304); *Cinque v. Ungaro, Weber and Brezing*, 622 So.2d 1051, 1052 (Fla.Dist. Ct.App.1993) ("That notice to a general partner is notice to a partnership is a principle too commonplace to require citation to authority.") *cf. Elmco Properties*, 94 F.3d at 921 (addressing due process claim of insufficient notice of RTC's receivership under FIRREA, noting that "courts have held that, once creditors actually learn that their debtors have filed for bankruptcy, they have a duty to inquire as to what they might be required to do to protect their interests, and, failing such inquiry, cannot claim lack of due process when those debts are discharged").

Thus RTC's notice to Mr. Lang constituted notice to New Hampshire.

### 5. *Pre-Disaffirmance Rent*

Finally, New Hampshire argues that it is entitled to summary judgment on the issue of back rent. While FIRREA cuts off a lessor's right to damages arising from disaffirmance of a lease, a lessor is nevertheless entitled to the "contractual rent" accruing before the effective date of the disaffirmance. 12 U.S.C. § 1821(e)(4)(B)(i). A lessor may not, however, recover "damages under any acceleration clause or other penalty provision in the lease." 12 U.S.C. § 1821(e)(4)(B)(ii).

New Hampshire submitted evidence showing that it was owed $31,838.53 in back rent, but $10,515.23 of that figure is for late fees, which the lease designates in paragraph 2.8 as a "Late Payment Penalty." (Pl.'s Mem. Opp. and Supp. Summ. J., Ex. 10, Ex. 1). New Hampshire does not argue that the late fees are not in fact a penalty despite their being so labeled, so the court will treat

---

4. Maryland recently replaced its Uniform Partnership Act with the Revised Uniform Partnership Act, which will become applicable to all Maryland partnerships on 1 January, 2003, with three exceptions not relevant here. 1997 Md. Laws Ch. 654 (H.B.251) (effective date provisions to be codified as Md.Code Ann., Corps. & Ass'ns § 9–1204).

them as such and holds that they are not recoverable. This reduces New Hampshire's claim to $21,323.30, which the RTC agrees, or at least does not disagree, that it properly owes. (Def.'s Mem. Opp. Summ. J. and Reply, at 6–7.) New Hampshire is holding a security deposit in the amount of $29,647.13, however, so although it prevails on its argument for recovery of back rent, there are no recoverable damages.[5]

A separate order follows.

---

5. New Hampshire's victory may not be purely pyrrhic, though, for the RTC never cross-claimed for recovery of the balance of its security deposit, choosing instead merely to oppose New Hampshire's motion to collect back rent on the ground that New Hampshire owed the RTC more than the RTC owed New Hampshire. Whether the RTC may at a later date claim the balance is not before the court, but the doctrines of *res judicata* and compulsory counterclaims may or may not prove relevant to that point. *See* Fed.R.Civ.P. 13(a).