In re MBA, INC., t/a MBA Management, Inc. (Including by consolidation Metro Business Associates, Inc., Case No. 82–01344–A; MBA of Washington, D.C. Inc. Case No. 82–01345–A; and California MBA, Inc., Case No. 82–01346–A), Debtors.

MBA, INC., t/a MBA Management, Inc., Plaintiff,

v.

VNU AMVEST, INC., and Disclosure, Incorporated, Defendants.

Bankruptcy No. 82–01343–A.
Adv. No. 83–0162–A.

United States Bankruptcy Court,
E.D. Virginia,
Alexandria Division.

Aug. 19, 1985.

Ronald L. Walutes, Annandale, Va., for debtor.

Stephen C. Greenberg, Murphy, McGettigan & West, P.C., Alexandria, Va., for defendant, VNU Amvest, Inc.

L. Marc Zell, Topf, Zell, Kolodny & Goldstein, Bethesda, Md., for defendant, Disclosure, Inc.

MEMORANDUM OPINION

MARTIN V.B. BOSTETTER, Jr., Bankruptcy Judge.

MBA, Inc., trading as MBA Management, Inc. ("MBA"), debtor herein, is in the business of personnel recruiting and placement. This adversary proceeding arises upon the second amended complaint of the debtor to recover an $18,000.00 placement fee allegedly owed by the co-defendants, Disclosure, Incorporated ("Disclosure") and VNU Amvest, Inc. ("Amvest"), as a result of Amvest's decision to employ one Mark Roberts ("Roberts") as an accountant and financial vice president.

■ MBA asserts that it is entitled to recover from Amvest and Disclosure on any of three theories: promissory estoppel, apparent agency, or contract implied in law. The parties have agreed that under the principles enunciated in *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), Virginia law, in particular Virginia's law governing choice of law, is the law to which this Court must refer to determine the rights and liabilities of the parties. It is well settled in Virginia that the law of the state having the most significant contacts with a transaction governs the rights and duties of the parties to the transaction. *See Begley v. Jeep Corp.*, 491 F.Supp. 63, 64–65 (W.D.Va.1980); *Willard v. Aetna Cas. and Sur. Co.*, 213 Va. 481, 482–83, 193 S.E.2d 776 (1973). The parties do not agree which state, Virginia or Maryland, is the state with the most significant contacts here. However, in a prior decision denying Disclosure's motion for summary judgment, this Court ruled that a claim for recovery based on promissory estoppel would be cognizable under either Virginia law or Maryland law provided MBA proved at trial the allegations pleaded in the complaint. *In re MBA Inc.*, 38 B.R. 671 (Bankr.E.D.Va.1984). Defendants do not dispute the availability in both states of actions based on MBA's alternate theories of recovery.

*Factual Background*

In April 1982, Roberts, then a senior accountant in the New York office of the accounting firm of Seidman & Seidman, was referred to Phillip Hamilton ("Hamilton") a recruiter at MBA. MBA's office is located in northern Virginia. Greg Jennings, a partner in Seidman & Seidman's Washington office, had made the referral based on Roberts' interest in relocating to the Washington area. Later the same month, another representative of MBA made a routine, unsolicited telephone call to the Maryland office of Disclosure and learned that Disclosure was seeking an individual with a strong accounting background to serve as chief financial officer of the company.

MBA's representative then telephoned Disclosure's chief financial officer at the time, Charles Wisemiller ("Wisemiller"), to obtain further information about the job. The representative told Wisemiller that MBA's standard fee for such a position in which the salary exceeded $50,000.00 was thirty per cent of the first year's salary. Wisemiller stated that he "had no problem" with the fee. MBA's representative then completed a Job Order Form describing the position with Disclosure.

Hamilton subsequently saw the information, determined that Roberts would be a viable candidate and telephoned Wisemiller to refer several candidates, including Roberts. Wisemiller already had learned of the availability of Roberts from Greg Jennings who had referred Roberts to MBA and also was a lifelong friend of Wisemiller's. Hamilton set up an interview for Roberts with Wisemiller for May 15, 1982. Wisemiller, in the meantime, also had placed advertisements for the position in major newspapers from which he drew approximately 300 responses.

In early May 1982, Wisemiller received from Hamilton an MBA "Send Out Slip" confirming the scheduled interview for Roberts. Hamilton testified that MBA's fee schedule is printed on the reverse side of the "Send Out Slip." The printed schedule is intended to confirm prior conversations between the employer and MBA concerning the fee. Although Roberts met

twice with a representative of Disclosure, an offer was not forthcoming.

The minority ownership of Disclosure is held by Amfo, Inc., a wholly-owned subsidiary of defendant Amvest. Amfo, Inc., Hixon Corporation (owned by Philip Hixon) and Snyder Corporation (owned by Robert Snyder) are all partners of Disclosure Partners which is, in turn, the 100 per cent owner of Disclosure Inc. Amvest, a wholly-owned subsidiary of a publicly-owned Dutch publishing company, was organized for the purpose of investing in American publishing enterprises. Amvest had closed the purchase of its interest in Disclosure on April 20, 1982. This was a complex transaction which gave Amvest a minimum 33⅓ per cent ownership combined with a 49 per cent profit share. Amvest's ultimate ownership percentage was to be determined over time based upon Disclosure's earnings.

Amvest, at least in part as a result of its acquisition of the interest in Disclosure, was planning· to move from New York to Washington, D.C.. Amvest did not then have a chief financial officer. Thomas Mastrelli ("Mastrelli") was performing many functions of a chief financial officer for Amvest. Mastrelli, however, had suggested to Johannes Niks ("Niks"), president of Amvest, that Amvest needed a full time chief financial officer of its own.

Niks wanted Mastrelli to review the technical accounting qualifications of any candidates for the job with Amvest. Mastrelli, who had become friendly with Wisemiller during the months of negotiation over the partial acquisition of Disclosure by Amvest, received some resumes, including Roberts', from Wisemiller and was informed by Wisemiller that Roberts had come through an employment agency. There was no indication on Roberts' resume that he had been referred by MBA.

On or about June 14, 1982, shortly before Wisemiller gave Roberts' resume to Mastrelli, Hamilton had telephoned Wisemiller to find out whether a decision had been made concerning Roberts, and Wisemiller informed Hamilton that Disclosure had decided not to hire Roberts. During this conversation, Wisemiller said that he knew that "an affiliate" of Disclosure, Amvest, was looking for an individual with similar qualifications and that, if Roberts were interested, Wisemiller would transmit Roberts' resume to Amvest's president, Niks.

Wisemiller further indicated that he would arrange an interview between Roberts and Niks whereupon Hamilton stated that he would proceed to contact Amvest. Wisemiller, however, indicated that Niks travelled frequently and was difficult to reach by telephone, whereas Wisemiller would be meeting soon with Niks and would take care of making the contact because it would be "easier" that way. Hamilton requested that Wisemiller also relay to Amvest that MBA represented Roberts and expected a thirty per cent fee.

Hamilton telephoned Wisemiller after a June 25, 1982 interview between Roberts and Niks, and Wisemiller told Hamilton that either Disclosure or Amvest would pay the fee and that Hamilton should not worry about it. Roberts also spoke with Wisemiller by telephone during the period June 25–June 30, 1982 and was told that Niks knew about the placement fee. Thereafter, Niks and Roberts met for a second interview in New York on July 14, 1982 during which Niks offered and Roberts accepted the job at Amvest.

After learning that Roberts had secured the job with Amvest, Hamilton telephoned Wisemiller and was advised to send the bill to Amvest. The record reflects also that between July 14 and August 2, when Roberts began work at Amvest, in a conversation between Wisemiller and Mastrelli, Wisemiller stated that Roberts was represented by an employment agency. Mastrelli passed along to Niks the information that Roberts had come from an employment agency, but Niks apparently paid little attention in the absence of corroboration either from the agency or from Roberts.

Roberts began working for Amvest on August 2, 1982, and on or about August 8, 1982, Niks received from MBA a bill for $18,000.00 for placing Roberts. This bill was the first direct contact between MBA

and Amvest. Niks asked Roberts if he had been represented by MBA, and Roberts confirmed that he had been. Subsequently, Niks spoke with Wisemiller and inquired as to why Amvest had received a bill from MBA. Wisemiller told Niks that Disclosure originally had received Roberts' resume from MBA. Niks told Hamilton on September 8, 1982, that Amvest did not intend to pay the bill.

Following Niks' disavowal of any obligation to pay, MBA began to investigate the relationship among Disclosure, Amvest and Amvest's parent corporation in The Netherlands. MBA also attempted to meet with a representative of the Dutch company. The bill, however, remained unpaid. MBA also contacted Disclosure's president, Robert Snyder, concerning the placement fee and was informed that because Disclosure had not hired Roberts it owed no fee.

It further appears from the record that MBA's policy was always to send a potential employer a "Send Out Slip" prior to a candidate's initial interview. If the candidate were later referred to a different division, the recruiter determined whether to send a further "Send Out Slip." Based on the testimony adduced at trial, MBA never transmitted to Amvest a "Send Out Slip" or correspondence of any kind and never made telephone contact with Niks or Amvest prior to sending the bill for the placement fee because of Wisemiller's representations to Hamilton. This forbearance was at least partially based on Wisemiller's description of Amvest as "an affiliate" of Disclosure and his statement that he would handle the initial step of the referral. Wisemiller told Hamilton not to contact Niks when the initial referral was made, because Niks was difficult to reach.

The record also reveals that Hamilton did not ask Wisemiller to forward to Amvest the initial MBA "Send Out Slip" which Disclosure had received prior to Roberts' first interview at Disclosure because Hamilton knew that Roberts already had met with Niks. When Hamilton continued to telephone Wisemiller concerning Roberts' progress with Amvest, Wisemiller accepted the calls and never suggested that Hamilton make direct contact with Amvest.

MBA did not investigate the nature of the Disclosure-Amvest connection or attempt to determine the relationship between the two entities until after Amvest had refused to pay the bill.

In connection with the *lex fori*, defendants have presented extensive arguments to support a finding of Maryland as being the state with the most significant relationship to the transaction here and to support the resulting finding that the law of Maryland should govern disposition of this matter. Plaintiff has argued vigorously in support of Virginia as the state with the most significant contacts.

This Court previously has ruled that, if the plaintiff were to prove the elements of promissory estoppel, recovery would not be prohibited under either Maryland law or Virginia law. *In re MBA Inc.*, 38 B.R. 671 (Bankr.E.D.Va.1984) (denying defendant Disclosure's motion for summary judgment). With no bar to recovery under the law of either state, this Court need not determine which of the two states has the most significant contacts. Thus, we may address the applicability of the doctrine of promissory estoppel.

Section 90 of the Restatement (First) of Contracts (1932) defines promissory estoppel as:

A promise which the promisor should reasonably expect to induce action or forbearance of a definite and substantial character on the part of the promisee and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise.

*Id.* To establish promissory estoppel there must be proven the following elements: (1) a promise, (2) reasonable and foreseeable reliance on the promise, (3) resulting detrimental action or forbearance by the promisee, (4) injustice avoidable only by enforcement of the promise. *Granfield v. Catholic University of America*, 530 F.2d 1035 (D.C.Cir.), *cert. denied*, 429 U.S. 821, 97 S.Ct. 68, 50 L.Ed.2d 81 (1976).

The promise must be supported by consideration. *Maryland National Bank*

v. United Jewish Appeal Federation of Greater Washington, Inc., 286 Md. 274, 407 A.2d 1130 (1979). The promisee's detrimental reliance, as demonstrated by its action or forbearance, satisfies this requirement. Id.; see also, Bender v. Design Store Corp., 404 A.2d 194 (D.C.App.1979).

■ Another essential element of promissory estoppel is that the defendant has made a binding offer in the form of a promise. Burst v. Adolph Coors Company, 650 F.2d 930, 932 (8th Cir.1981) (per curium). The promise, however, need not be as definite as in a contract and may lack traditional contract elements such as "mutuality". Bender v. Design Store Corp., 404 A.2d 194 (D.C.App.1979), supra; Debron Corp. v. National Homes Construction Corp., 493 F.2d 352, 357 (8th Cir. 1974). The promise must be explicit in that an "expression of intentions" is insufficient. Granfield v. Catholic University, supra, 1040; see also, FMC Finance Corp. v. Reed, 592 F.2d 238 (5th Cir.1979).

In the case sub judice, the preponderance of the evidence supports the conclusion that Wisemiller promised to inform Amvest of MBA's continuing representation of Roberts and of MBA's expectation of a placement fee. There is no question but that Hamilton believed Wisemiller had made such a promise.

■ There is also no question that MBA, through Hamilton, relied on the perceived promise by Wisemiller. MBA failed to contact Amvest directly or even investigate the company. And one who by language or conduct "leads another to do what he would not otherwise have done" is liable for "disappointing the expectations" aroused. Goodman v. Dicker, 169 F.2d 684 (D.C.Cir.1948).

MBA relied to its detriment on Wisemiller by forbearing to take steps to notify Amvest of MBA's interest in the employment of Roberts. Hamilton had seven years' experience in the personnel recruitment business. It is unreasonable to conclude that he would not have taken the simple step of contacting Amvest directly if there had been any doubt about Wisemiller performing. Wisemiller knew of MBA's

reliance and never instructed Hamilton to deal directly with Amvest until after Amvest had hired Roberts. Moreover, Amvest acquired a highly-qualified employee with minimal effort. It would have been more reasonable than not in the circumstances for Amvest to expect that such a qualified candidate would be represented by a "head hunter." Accordingly, to avoid injustice, the promise should be enforced.

■ Plaintiff has "no remedy at law" here, because no contract enforceable in the traditional sense exists between MBA and Amvest. Enforcement in the traditional sense is not available against Disclosure, with whom MBA did have a contract, because Disclosure did not hire Roberts. Accordingly, plaintiff's only remedy would be an equitable one. The measure of damage in promissory estoppel is the loss sustained by expenditures made in reliance, or the reliance interest, not necessarily the full fee based upon the benefit of the bargain as made with Disclosure. Goodman v. Dicker, supra, at 685.

■ Even actual expenditures may not be recoverable if the Court determines that the promise was so conditional as to render the damages speculative. Gruen Industries, Inc. v. Biller, 608 F.2d 274 (7th Cir. 1979). In the Gruen case, the Court examined a carefully negotiated and drafted stock purchase agreement which defendant ultimately refused to execute. Plaintiff had expended substantial fees to its attorneys. The Court concluded that the agreement could well have failed on the basis of the many contingencies contained therein, so that recovery would put plaintiff in a better position than if the promise to execute the agreement had been kept. The Court, therefore, denied recovery, stating that "[e]very businessman faces the risk that the substantial transaction costs necessary to bring about a mutually beneficial contract will be lost if the negotiations fail to yield a satisfactory agreement." Id. at 282.

In the transaction here, there is no evidence that Amvest would have agreed to pay the fee demanded by MBA even if

MBA had been more active in contacting Amvest. It is entirely speculative whether Amvest would have either interviewed Roberts or hired him if Amvest had been more fully aware of MBA's representation of the candidate.

■ Accordingly, the Court concludes that MBA cannot recover on a theory of promissory estoppel. It is entirely speculative whether Amvest, had it been fully apprised of MBA's role in the placement of Roberts, would have hired him.

The enforceability of the promises made by Wisemiller must also be considered. Wisemiller promised initially to convey information concerning MBA to Amvest and, later, that one of the two defendants would pay the placement fee. Wisemiller, as an employee of Disclosure, could not bind Amvest to pay a fee absent an agency relationship between himself and Amvest.

■ Let us next turn to the issue of whether or not apparent agency has been established. The theory of apparent agency generally is applicable only in circumstances in which it is the principal, rather than the agent, who represents or holds out to third parties that the agency exists [1]. Apparent authority will exist only to the extent that it is reasonable for the third person dealing with the agent to believe that the agent is authorized. *Restatement of Agency 2d § 8, Comment c.* However, it is the responsibility of the principal to exercise control over "the information which comes to the mind of the third person." *Restatement of Agency 2d § 27, Comment a.* Thus, the principal must either intend the resulting belief in the agent's authority or at least realize "that his conduct is likely to create such belief." *Id.*

■ In Virginia, the principal also may be bound if he has permitted the agent to make representations of authority. *Neff Trailer Sales, Inc. v. Dellinger,* 221 Va. 367, 269 S.E.2d 386 (1980). In such circumstances, the apparent authority is the real authority. *Id.* This principal also holds true in Maryland. *McClure v. E.A. Blackshere Company,* 231 F.Supp. 678 (D.Md.1964); *Brager v. Levy,* 122 Md. 554, 90 A. 102 (1914).

■ Furthermore, Virginia case law indicates that if extrinsic circumstances, such as employment, make out a *prima facie* case of agency, the agent's or servant's own representations become admissible and the master must assume the burden of proving that the servant acted outside the scope of his authority. *Turner v. Burford Buick Corp.,* 201 Va. 693, 112 S.E.2d 911 (1960).

There is no question but that Wisemiller, as an employee of Disclosure, was an agent of Disclosure and held considerable apparent and actual authority to act for his employer. He did not, however, have the authority to make a final hiring decision regarding a chief financial officer. The evidence does illustrate that Wisemiller had both apparent and actual authority to bind Disclosure to pay a placement fee to MBA if any of its candidates were hired by Disclosure.

Roberts, however, was hired by Amvest, not Disclosure. Accordingly, if MBA is to recover, the Court must find that Wisemiller was the apparent agent of Amvest. The evidence adduced shows clearly that Amvest requested Wisemiller's help in its search for a chief financial officer of its own, that Wisemiller transmitted Roberts' resume to Amvest and discussed the trans-

---

1. 1. "Apparent authority is the power to affect the legal relations of another person by transactions with third persons, professedly as agent for the other, arising from and in accordance with the other's manifestations to such third persons." *Restatement of the Law, Second, Agency 2d § 8 (1958)* (hereafter *"Restatement of Agency 2d"*).

"Apparent authority results from a manifestation by a person that another is his agent, the manifestation being to a third person and not, as when authority is created, to the agency." *Restatement of Agency 2d § 8, Comment a.* "[A]pparent authority to do an act is created as to a third person by written or spoken words or any other conduct of the principal which, reasonably interpreted, caused the third person to believe that the principal consents to have the act done on his behalf by the person purporting to act for him." *Restatement of Agency 2d § 27.*

mittal with Hamilton at MBA. It does not appear that Hamilton originally believed Wisemiller's authority extended to the point of binding Amvest to pay the recruiting fee. Rather, Hamilton's concern seemed more to be that the information regarding the fee should reach Amvest. Hamilton's failure to provide Amvest with a "Send Out Slip" indicates that he was relying on a perception of at least some degree of apparent agency. Wisemiller's statement in late June 1982 that either Disclosure or Amvest would pay MBA's fee reasonably could be expected to reinforce such a perception.

Wisemiller never told Hamilton to deal with Amvest directly. He continued to discuss Roberts' situation with Hamilton and consistently conducted himself in a manner so as to reinforce Hamilton's perception that Wisemiller was the apparent agent of Amvest.

■ Apparent agency, however, rests primarily upon either a representation by or a failure to act of the principal. Here the principal is Amvest and its only action that might be characterized as a holding out of Wisemiller as its agent is the request for Wisemiller's help in finding candidates for Amvest to interview. This single action, even when considered in light of Amvest's substantial ownership position in Disclosure, is not sufficient to create apparent agency in Wisemiller. All of the representations to Hamilton here were made by the "agent", Wisemiller, not by the "principal", Amvest.

In *Turner v. Burford Buick Corp.*, 201 Va. 693, 112 S.E.2d 911 (1960), the plaintiff showed that the agent was driving a "Burford Buick" automobile with dealer license plates at the time of the incident with the plaintiff. The presence of such overt badges of agency made the agent's own representations of authority binding. There are no such badges of authority in the instant case.

■ Wisemiller was an employee and agent of Disclosure which was, in turn, partially owned by Amvest. Ownership can result in actual, rather than apparent, authority being imputed to the agent. In this case, however, the defendants' testimony that Amvest's interest in Disclosure was strictly financial and that Amvest exercised no operational control over Disclosure is undisputed. Moreover, two other entities, Disclosure Partners and Amfo, Inc., are interposed in the chain which links Amvest to Disclosure. While the defendants are closely aligned, it is the opinion of the Court that the connection is too remote to support a conclusion that actual authority to act for Amvest is imputable to Wisemiller. *Cf. Mass Transit Administration v. Granite Construction Co.*, 57 Md.App. 766, 471 A.2d 1121 (1984).

■ We then turn to whether or not a contract implied-in-law, or quasi-contract, can be inferred in the instant case. The quasi-contract, or contract implied-in-law, is not a contract within the generally-accepted meaning but is an equitable concept to prevent unjust enrichment. It resembles a duty to make restitution and imposes an obligation to pay even though no intention of the parties to bind themselves can be discerned. A court properly resorts to quasi-contract only in the absence of an express contract or contract implied-in-fact, and only when it would be unfair for the recipient to keep a benefit without paying for it[2]. *Bloomgarden v. Coyer*, 479 F.2d 201 (D.C.Cir., 1973); *see also*, 1 Williston, *Contracts* § 3 (3d ed. 1957).

■ The quasi-contract is the plaintiff's remedy at law when the facts support a claim of unjust enrichment. The three elements that must be established are:

1.  a benefit conferred upon the defendant by the plaintiff;
2.  An appreciation or knowledge of the benefit by the defendant; and

---

2. A contract implied-in-fact is a true contract containing all necessary elements for a binding agreement except that it has not been committed to writing or stated orally in express terms, but rather is inferred from the conduct of the parties in the circumstances. The distinction between contracts implied-in-fact and contracts implied-in-law is set forth more fully in 1 Williston *Contracts* § 3A (3d ed. 1957).

3. The acceptance or retention of the benefit by the defendant in circumstances which make it inequitable for the defendant to retain the benefit without paying for its value.

*Mass Transit Administration v. Granite Construction Co.*, 471 A.2d at 1125; *Everhart v. Miles*, 47 Md.App. 131, 422 A.2d 28 (1980).

■ There is no express contract between Amvest and MBA. Amvest had a substantial minority interest of at least 33 per cent in Disclosure, Inc. Thus, the defendants are closely aligned. Amvest learned of Roberts' availability from Disclosure, and may be charged with the knowledge held by Disclosure that Roberts had been referred by MBA which expected a fee. Amvest obtained a highly-qualified employee without expense or significant expenditure of time. Wisemiller's conduct toward Hamilton gave no signals to contradict Hamilton's belief that direct communication with Amvest was unnecessary, and Wisemiller never told Hamilton to deal directly with Amvest. To permit defendants to avoid compensating MBA here would be to leave them unjustly enriched by this transaction. Accordingly, it must be determined that MBA has established a right to recover from Amvest on a quasi-contract or contract-implied-in-law.

■ MBA, however, could have protected its fee simply by following its normal procedure and mailing a "Send Out Slip" to Amvest once the initial interview had been set up. Amvest then could have chosen not to avail itself of MBA's services. Hamilton exercised poor judgment in relying on Wisemiller to perform. Furthermore, MBA expended only moderate time and effort to place Roberts with Amvest.

Accordingly, for the foregoing reasons it is the finding of the Court based upon the evidence that an equitable amount to be awarded to the plaintiff is $1,500.00, that sum to be assessed against Amvest.

Both Disclosure and Amvest have included among their defenses the assertion that this Court lacks jurisdiction over this matter. The basis for this defense is the ruling of the United States Supreme Court in *Northern Pipeline Construction Co. v. Marathon Pipe Line Company*, 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982).

This case is governed by the provisions of the Emergency Rule promulgated by the district courts including the United States District Court for the Eastern District of Virginia in December 1982 upon the expiration of the Supreme Court's stay of the effect of the *Marathon* decision. The validity of the Emergency Rule has been upheld consistently. *See, e.g., In re Kaiser*, 722 F.2d 1574 (2d Cir.1983); *White Motor Corp. v. Citibank, N.A.*, 704 F.2d 254 (6th Cir.1983).

Section (d)(3)(B) of the Emergency Rule restricts the power of bankruptcy judges to enter final judgments or orders in "related proceedings" to those cases in which the parties have consented to such entry of judgments or orders by the bankruptcy judge. The case at bar is a "related proceeding" as defined in section (d)(3)(A) of the Emergency Rule. Defendants here, while continuing to assert the defense by statements made prior to trial, have expressly requested this Court to rule on the substantive issues. The Court interprets defendants' request as consent to jurisdiction. Accordingly, this Court rules that it has jurisdiction over this matter.

An appropriate Order will enter.