**FEDERAL DEPOSIT INSURANCE CORPORATION and WRH Mortgage, Inc., Plaintiffs,**

v.

**S.A.S. ASSOCIATES et al., Defendants.**

**No. 2:97cv1173.**

United States District Court, E.D. Virginia, Norfolk Division.

April 23, 1999.

William C. Bischoff, Stallings and Richardson, P.C., Virginia Beach, VA, Frederick A. Douglas, Thomas D. Bridenbaugh, Leftwich & Douglas, P.L.L.C., Washington, DC, for plaintiffs.

Jon D. Becker, Andrew I. Becker, Diamonstein, Becker & Staley, P.L.C., Virginia Beach, VA, for defendants.

### OPINION & ORDER

PRINCE, United States Magistrate Judge.

This case involves the Financial Institutions Reform, Recovery and Enforcement Act ("FIRREA"), 12 U.S.C. § 1821 *et seq.* (1998). The plaintiffs, the Federal Deposit Insurance Corporation ("FDIC") and WRH Mortgage, Inc. ("WRH"), seek a declaratory judgment either allowing them to foreclose on property that the defendant, S.A.S. Associates ("SAS"), owns and used to secure a loan from the plaintiffs' predecessor, or otherwise requiring SAS to pay the outstanding balance due on that loan. The parties have consented to have a magistrate judge dispose of their claims pursuant to 28 U.S.C. § 636(c), and the Court has jurisdiction under 28 U.S.C. §§ 1345, 1367(a).

Following the denials of a motion to dismiss and cross motions for summary judgment, the parties reiterated at a paper trial held by this Court that no genuine issues of material fact remain in this case. Further, WRH and the FDIC again stipulated that the loan and Note on which their claims depend and the lease that the FDIC had previously repudiated constitute a single, integrated contract. For reasons discussed below, the Court finds this stipulation dispositive of the claim that implicates FIRREA, and that the plaintiffs cannot prevail on their remaining state law claims.

### I. *FINDINGS OF FACT*

As noted, neither party contests the following, relevant facts. On October 3, 1985, the plaintiffs' predecessor in interest, the Investors Federal Savings Bank ("In-vestors"), contracted with SAS to form a "Construction, Loan and Lease Agreement" ("Agreement"). Under the Agreement, SAS would allow Investors to construct a bank branch on property that SAS owned in Virginia Beach, Virginia; Investors could then rent this property from SAS for a lease term lasting twenty-five (25) years.

In exchange, SAS received $250,000.00, plus an additional $30,000.00 in "soft costs" that SAS had incurred "prior to the date of the" Agreement. Investors also eventually paid SAS $310,423.19, the sum needed to construct the bank branch.

And once construction of the bank had finished, SAS also had an option under the Agreement to take a "permanent" loan from Investors. The Agreement specified that if SAS took this loan,

> [t]he Loan Amount shall be evidenced by a deed of trust note secured by a first deed of trust on the aforesaid real property which note shall be non-negotiable and shall expressly provide therein that payment thereunder shall be subject to and conditioned upon full and faithful performance by [the lessee Investors] of the terms and conditions of the herein-below set forth Lease Agreement ...

On February 5, 1987, SAS did opt to take this permanent loan from Investors, in the amount of $622,000.00, at an interest rate of ten (10) percent per annum. As required by the Agreement, a Deed of Trust Note ("Note") evidenced this debt, and, like the Agreement, the Note indicated that the right to payment under it depended on performance of "the terms of that certain Construction, Loan and Lease Agreement, dated October 3, 1985."

SAS secured this loan debt with a Deed of Trust and Security Agreement. SAS also had to repay the proceeds of the loan and the interest accruing from it over a period of twenty-five (25) years, and it agreed to do so in monthly installments of $5,652.18.

Because Investors' lease and the loan it gave SAS both roughly covered the same twenty-five year period, Investors only had to pay SAS the difference between its larger, monthly lease payments and the smaller, monthly loan payments that SAS owed. Investors made all the payments that this arrangement required until February 1, 1992.

Earlier, however, Investors had become insolvent and, on December 13, 1991, the Office of Thrift Supervision ("OTS") placed Investors in receivership and appointed the Resolution Trust Corporation ("RTC") as both its receiver and conservator. Accordingly, as receiver, the RTC acquired all rights and duties that Investors had previously held, including those arising from the Agreement and the Note.

On March 1, 1992, after finding the obligations imposed by the lease were "burdensome," the RTC exercised its statutory authority under the FIRREA and repudiated the lease it had with SAS. *See* 12 U.S.C. § 1821(e). Shortly thereafter, SAS ceased making the payments it owed under the loan, arguing then, as it does now, that the RTC's repudiation of the lease portion of the Agreement discharged its obligations to perform under the loan it originally took from Investors.

By operation of a federal statute made effective on December 31, 1995, the FDIC replaced the RTC as the receiver of Investors' property. *See* 12 U.S.C. § 1441a(m)(1). The FDIC similarly demanded that SAS make the loan payments, and SAS similarly refused. On December 18, 1997, the FDIC filed the instant Complaint, and, by order entered October 5, 1998, WRH joined the FDIC as a plaintiff in this case, as WRH had purchased the FDIC's interest in the Agreement and Note.[1]

1. The FDIC's motion to withdraw from the case after transferred its interest in the Agree-

## II.  CONCLUSIONS OF LAW

In their Complaint and various briefs, the plaintiffs conclusorily assert that the repudiation of the lease its predecessor had with SAS did not repudiate the loan or Note formed under the same agreement. While they acknowledge that the obligations under both the loan and the lease fall within the Agreement, they insist that SAS still owes them either the unpaid balance of the Note or the Virginia Beach property itself, which SAS used as collateral to secure the loan. The plaintiffs raise claims involving the FIRREA, breach of contract, and unjust enrichment, which the Court will discuss seriatim.

### A.  The Financial Institutions Reform, Recovery and Enforcement Act

To cope with the economic crisis of the 1980s, when hundreds of banks and other federally-insured financial institutions collapsed, Congress enacted the FIRREA, "an emergency measure" designed to save these institutions by providing, among other changes, greater federal oversight of failed savings and loan associations placed in receivership. *See Tillman v. Resolution Trust Corp.*, 37 F.3d 1032, 1035 (4th Cir.1994); *Howell v. Fed. Deposit Ins. Corp.*, 986 F.2d 569, 571 (1st Cir.1993). FIRREA specifically empowers receivers like the RTC, and its statutory successor, the FDIC, to repudiate contracts or leases that a failed bank had made when, like here, the FDIC found that contract or lease "burdensome" and that repudiation would "promote the orderly administration of" the failed institution's affairs. *See* 12 U.S.C. § 1821(e)(1).

Further, FIRREA expressly limits the damages that the nonbreaching party to that lease or contract can recover. Under 12 U.S.C. § 1821(e)(4)(B)(i), a lessor whose lease the FDIC had repudiated can only receive the "contractual rent" that accrued before the effective date of the disaffirm-

ment and Note was denied.

ance. In addition, the lessor cannot recover any "damages under any acceleration clause or other penalty provision in the lease." 12 U.S.C. § 1821(e)(4)(B)(ii).

SAS does not dispute the reasonableness of the RTC's decision in finding the lease "burdensome" or in repudiating the lease altogether. Rather, following the repudiation of its lease, SAS seeks nothing more than to discontinue payments on the loan that, along with the lease, constituted the parties' entire contract. Further, as the parties' stipulated facts infer, SAS made these loan payments by simply subtracting them from the lease and other monthly payments that Investors owed it.

In *Hackel v. FDIC,* cited at length by SAS, the FDIC had also repudiated a lease, then sought to enforce a related note and guaranty against the lessor, who had stopped making payments on them. 858 F.Supp. 289, 290 (D.Mass.1994). There, like here, the note, guaranty and lease all constituted "a single, integrated transaction," and the parties also used "the rental payments under the lease to service the payments and costs resulting from the Note." *Id.* at 291–92. After finding that the lease, note and guaranty were, in fact, "one agreement," the court concluded that "when the FDIC disaffirmed the Lease, it necessarily repudiated the entire agreement, of which the Lease was an integral part *** [and] the Note and [guaranty], other integral parts of the same agreement, became null and void and, thus, unenforceable." *Id.* at 292.

■ Here, the parties have already stipulated that the lease, loan, and Note also made up a single, integrated agreement. SAS, of course, can easily liken its situation to that in *Hackel* because, as in that case, the FDIC here repudiated the lease portion of the Agreement, and that lease similarly "serviced" SAS's payments on the Note and loan. *See* 858 F.Supp. at 291–92. For the reasons discussed below, moreover, the Court finds the logic and rationale in *Hackel* persuasive and consistent with FIRREA.

■ As SAS argued at trial, FIRREA created the power to repudiate contracts and leases; but nothing in either the language or legislative history of FIRREA reveals that Congress also wanted either the right to unilaterally modify or alter contracts pursuant to the will of the FDIC, or the right to enforce only those provisions of a contract that the FDIC found palatable. Nor has the Court found any authority that says FIRREA enables the FDIC to correct bad decisions it may have made—like the one it may have made here—when exercising its repudiation powers. *Compare Olympic Towers Assocs. v. Goldome Bank,* 1995 WL 264677, *6 (W.D.N.Y.1995) (no error when FDIC decision to repudiate lease allegedly caused it to lose more money, and the FDIC thereby "made a poor business decision"). And both *Hackel* and these arguments seem to apply with particular force in this instance because, as SAS also emphasizes, the Agreement and the Note used to evidence the loan made clear that SAS only had to pay the loan if Investors continued to pay the lease.

The Court also notes that, contrary to representations made at trial, *Hackel* does not stand alone as the only support for the conclusions drawn here. In *RTC Mortgage Trust v. Guadalupe Plaza,* 918 F.Supp. 1441, 1447, the court indicated that sufficient evidence existed to show that a note, lease and mortgage constituted a single transaction, and that the plaintiff's repudiation of the lease would have discharged the obligations stemming from the note and mortgage. And in *In re Miraj and Sons, Inc.,* 192 B.R. 297, 311–12 (Bankr.D.Mass.1996) and *Jenkins–Petre Partnership One v. RTC,* 1991 WL 160317, *6–7 (D.Colo.1991), the courts there similarly entertained defenses based on "integrated contracts" to claims seeking recovery on unpaid notes, and only rejected them when, as a matter of fact, they determined that the notes bore no relation to the repudiated contracts at issue. *See also*

*Cardente v. Fleet Bank of Maine, Inc.,* 796 F.Supp. 603, 610–11 (D.Me.1992) (rejecting "single contract" defense to claim involving section 1823(e) after finding that note, lease and loan were separate agreements).

Undeterred, plaintiffs respond with two vague arguments, neither of which the Court finds persuasive. First, they baldly assert that if SAS can retain the proceeds of the loan, SAS "would receive a windfall" or (as they argued at trial) an "income stream" that constitutes "precisely the sort of 'penalty provision' that Congress determined to be unenforceable when it enacted 12 U.S.C. § 1821(e)(4)(B)(ii)." Yet, plaintiffs have not cited one case or any other authority to support their hyperbolic view of the prohibition against penalty clauses. If this case presented "precisely" the situation that Congress had in mind when it enacted 12 U.S.C. § 1821(e)(4)(B)(ii), surely some authority bearing a resemblance to it would exist.

Additionally, the Court's own research has not yielded a single authority that extends the FIRREA penalty clause proscriptions to instances involving "windfalls," "income streams" or other attenuated theories of what constitutes an impermissible claim for damages. *See, e.g., Employees' Retirement System of Alabama v. RTC,* 840 F.Supp. 972, 988–89 (S.D.N.Y.1993) (RTC presented "unthinkable" argument when claiming that FIRREA barred "windfall" resulting from bondholders who sought market value of bonds upon repudiation); *Citibank (South Dakota) v. FDIC,* 827 F.Supp. 789, 791–93 (D.D.C.1993), *rev'd in part on other grounds,* 857 F.Supp. 976 (D.D.C.1994) (FIRREA did not bar claim for damages seeking value of a repudiated contract's non-compete clause despite FDIC's "attempt to equate [that clause] ... with a penalty clause" and its emphasis on "the phrase 'income stream' "). To the contrary, the few authorities that have addressed the penalty clause provision have found a damages claim barred only when it directly sought "late fees" or "future rent." *See, e.g., RTC v. Ford Motor Credit Corp.,* 30 F.3d 1384, 1387 (11th Cir.1994) (FIRREA penalty clause prohibited claim by party to a repudiated lease for damages based on "future rent"); *New Hampshire Assoc. Ltd. v. FDIC,* 978 F.Supp. 650, 656–57 (D.Md.1997) (FIRREA penalty clause barred claim for "late fees" designated in the repudiated lease as a "Late Payment Penalty").

■ Most importantly, the FIRREA penalty clause proscription says it applies to "any acceleration clause or other penalty provision in the lease." *See* 12 U.S.C. § 1821(e)(4)(B)(ii). The Court believes that this language clearly envisions an actual term or clause in a lease contract that creates penalties for, among other examples, the failure to make timely rent payments. The amorphous "windfall" penalty that plaintiffs present here does not fit within that language. Accordingly, since plaintiffs' view of the penalty provision would appear to frustrate the plain meaning of the statute—not to mention the dictates of common sense—the Court finds their first argument meritless.

The plaintiffs' second argument, in which they assail and attempt to distinguish the *Hackel* decision, is even less availing. Inexplicably, the plaintiffs argue that *Hackel* turned on "the *D'Oench Duhme* doctrine and its statutory counterpart codified at 12 U.S.C. § 1823(e)," and not section 1821(e). Not surprisingly, they fail to identify any provision of FIRREA or any other authority when they also blandly assert that *Hackel* "is contrary to the clear statutory wording of FIRREA and is inconsistent with the congressional intent behind FIRREA."

Because the Court has already determined that the decision in *Hackel* makes eminent sense and that it comports with the language in FIRREA, it need not belabor arguments that the plaintiffs themselves failed to support with authority or discuss with clarity. Further, the Court suggests that plaintiffs re-read the author-

ity they attack: *Hackel* does not once mention or even allude to the *D'Oench Duhme* doctrine or 12 U.S.C. § 1823(e), and it clearly involved 12 U.S.C. § 1821(e).[2] *See* 858 F.Supp. at 291–292.

### B. *Breach of Contract and Quasi–Contract*

Having determined that the repudiation of the lease relieved SAS of its obligations to pay the loan, the Court must also find that SAS did not breach the Agreement or its obligations under the Note. Thus, plaintiffs cannot prevail on their breach of contract claim.

▆ In addition, the Court also finds that plaintiffs' claim for restitution fails for at least two reasons. First, plaintiffs base their claim for restitution on the theory of quasi-contract, which is not a contract at all, but rather an equitable remedy that courts fashion to prevent unjust enrichment. *MBA, Inc. v. VNU Amvest, Inc.*, 51 B.R. 966, 974 (Bankr.E.D.Va.1985); *Vollmar v. CSX Transp.*, 898 F.2d 413, 417 note 3 (4th Cir.1990). Yet, a party may not recover for claims sounding in quasi-contract or unjust enrichment when an express or implied contract already governs its relationship with a defendant. *Bright v. QSP, Inc.*, 20 F.3d 1300, 1306 (4th Cir.1994) (citing *Acorn Structures, Inc. v. Swantz*, 846 F.2d 923, 926 (4th Cir.1988)); *Occidental Life Ins. Co. v. Ryan & Assocs., Inc.*, 496 F.2d 1255, 1267 (4th Cir.1974); *see also VNU Amvest, Inc.*, 51 B.R. at 974 ("[a] court properly resorts to quasi-contract only in the absence of an express contract or contract implied-in-fact"); 1 Williston, Contracts § 3 (3d ed.1957). Accordingly, the Agreement here clearly precludes plaintiffs' attempt to recover in quasi-contract.

▆ Second, even if the Court accepted plaintiffs' contention that they can receive restitution despite the Agreement they had with SAS, (*see* Br. in Supp. of Pls.' Opp. to Defs.' Mot. for Summ. J. at 2–3), they still could not prevail on this claim. To recover in quasi-contract, the plaintiffs had to establish that 1) they conferred a benefit on SAS; 2) with the reasonable expectation of payment; 3) SAS knew or should have known of that expectation; and 4) allowing SAS to retain this benefit in these circumstances without paying for the value of the Note would result in unjust enrichment. *See Nossen v. Hoy*, 750 F.Supp. 740, 744 (E.D.Va.1990) (citing *Provident Life & Acc. Ins. v. Waller*, 906 F.2d 985, 993 (4th Cir.1990)).

▆ In this case, plaintiffs got exactly what their predecessor bargained for: payments on the loan until payments on the lease stopped. The Court thinks it somewhat obvious that plaintiffs could not reasonably expect more when the plain language of the Agreement and the Note both indicated as such. Alternatively, therefore, the Court finds that plaintiffs have failed to show either a reasonable expectation of payment or a situation involving inequity or unjust enrichment.

### III. *CONCLUSIONS*

Because plaintiffs repudiated the lease portion of the Agreement their predecessor had formed with SAS, they thereby discharged the obligation SAS had to repay the loan arising from that same Agreement. Further, the penalty clause provision in FIRREA, 12 U.S.C. § 1821(e)(4)(B)(ii), does not bar SAS from retaining this "windfall" because the plain language of that clause contemplates a lease term or provision, and the plaintiffs

---

**2.** This does not represent the only instance in this case when plaintiffs, innocently or not, have mischaracterized precedent. In a summary judgment memorandum, plaintiffs cited *Jenkins–Petre Partnership One v. RTC*, 1991 WL 160317 (D.Colo.1991), for the proposition that section 1821(e) of FIRREA barred "claims for damages resulting from [the] re-

pudiation of [the] lease component of sale-leaseback." As the Court noted above, however, the *Jenkins–Petre* court expressly found that, rather than "components" of one agreement, the Note and lease in that case were simply separate, unrelated agreements. *See* 1991 WL 160317 at *6.

have not identified any such provision. Accordingly, since this repudiation excused SAS from performing under the Agreement, Note and loan, no breach of contract occurred, and the plaintiffs can receive neither a declaration obligating SAS to pay the Note nor a declaration of judicial foreclosure on the Virginia Beach property at issue.

Also, since a contract already defined the relationship between the plaintiffs and SAS, plaintiffs have no right to recover in claims sounding in restitution or quasi-contract. And even if the Agreement by itself did not preclude quasi-contractual relief, the plaintiffs still failed to establish that they had either a reasonable expectation of payment or that unjust enrichment would result if SAS retained the benefits of the loan. As the Agreement and the Note clearly indicated, the plaintiffs could only receive payment on the Note evidencing the loan so long as they continued to make payments on the lease. Therefore, the Court finds plaintiffs' remaining claims unavailing, and it need not reach arguments SAS raised concerning physical possession of the original Note, VA.CODE § 8.3A–104, or the FIRREA statute of limitations.

### ORDER

For the reasons stated above, the Court ORDERS that JUDGMENT be entered in favor of the defendants on the plaintiffs' complaint.