In re FAS MART CONVENIENCE STORES, INC., et al., Debtors.

No. 01–60386–DOT.

United States Bankruptcy Court, E.D. Virginia, Richmond Division.

Aug. 4, 2004.

Benjamin Ackerly, Richmond, VA, Tyler P. Brown, Washington, DC, Michael G. Wilson, for debtors.

Carl F. Lettow, James S. Carr, Denver G. Edwards, Washington, DC, for BP Products North America Inc. f/k/a Amoco Oil Company, Inc.

## MEMORANDUM OPINION

DOUGLAS O. TICE, JR., Chief Judge.

Hearing was held April 29, 2004, on trustee Keith L. Phillips' objections to claim numbers 744, 745, 746, 747, 749, 789, and 790 filed by creditor BP Products North America, Inc., f/k/a Amoco Oil Company. Each of Amoco's proofs of claim were identical and alleged that Amoco held a § 507(a) priority claim against debtors Fas Mart Convenience Stores, Inc., et al., for $5,100,000.00 plus interest and fees. Trustee objected to claim number 744 on the ground that it was misclassified as a priority claim when it was in fact a general unsecured claim. Trustee objected to the remaining seven claims as duplicative of claim number 744.

In support of its claims against debtors, Amoco put forth two arguments. First, Amoco argued that it had an administrative and a secured claim against debtors derivative of the claims of an entity affiliated with debtors, Fas Mart Petroleum ("FMP"). Second, Amoco argued that it had direct claims against debtors because debtors received the benefit of the post-petition financial agreement struck by Amoco and FMP. After debtors filed their petitions, FMP executed a $3,000,000.00 note in favor of Amoco, and FMP retained $3,000,000.00 in cash that was payable to Amoco. Amoco alleged that the execution of this note and FMP's concurrent retention of cash enabled FMP to provide debtors cash and trade credit without which debtors could not have continued operating post-petition.

At the conclusion of hearing on April 29, the court ruled from the bench that trustee's objection to each of Amoco's derivative claims was sustained, and the remaining direct claims were taken under advisement. By order entered July 15, 2004, the court sustained trustee's objection to each of Amoco's derivative claims.

This opinion considers Amoco's so-called direct administrative claims against debtors. For the reasons stated below the court will sustain trustee's objection to these claims.

### Findings of Fact.

Owais A. Dagra began business in the convenience store industry by acquiring convenience stores in central Virginia in the early 1990s. Mr. Dagra established several of the debtor entities for the purpose of acquiring groups of branded convenience stores, including the Fas Mart Convenience Stores, Inc. group of forty-five convenience stores purchased in 1998. Mr. Dagra also established FMP as a separate petroleum company to provide fuel to debtors and other retail locations. Mr. Dagra is the sole shareholder of the debtor entities and FMP.

On March 9, 2001, debtors filed their voluntary chapter 11 petitions, and the court granted debtors' motion to consolidate the cases for procedural purposes.

On March 15, 2001, Amoco and FMP executed a Credit and Security Agreement. Under the terms of the agreement FMP affirmed an approximately $8,000,000.00 debt it owed to Amoco. Of that amount, $6,000,000.00 represented past due fuel payments and $2,000,000.00 represented outstanding trade credit. FMP also immediately paid Amoco $2,362,145.00 in cash, and Amoco received

a $3,000,000.00 note secured by all of FMP's assets, including an assignment of FMP's lien on and security interest in debtors' fuel inventory. The $2,362,145.00 figure was the result of the setoff of a $3,122,318.00 cash payment by FMP against $760,173.00 in credit card proceeds that Amoco held at the time and was contractually obligated to remit to FMP. Although debtors' principal, Mr. Dagra, was present during the negotiations, debtors were not a party to the Credit and Security Agreement.

On March 19, 2001, FMP and debtors executed a Grid Note through which FMP provided debtors post-petition ("DIP") financing. Debtors received three payments from FMP under the note totaling over $4,200,000.00: $1,000,000.00 on March 19, 2001; $2,500,000.00 on March 28; and $760,172.00 on March 29. All sums that debtors borrowed under the Grid Note have been repaid to FMP.

On March 1, 2002, Amoco filed eight identical proofs of claim stating that Amoco held a § 507(a) priority claim against debtors Fas Mart Convenience Stores, Inc., et al., for $5,100,000.00 plus interest and fees. This figure represented the balance of the $3,000,000.00 note plus $2,100,000.00 in outstanding trade credit. The proofs of claim were assigned numbers 744, 745, 746, 747, 749, 789, and 790.

Keith L. Phillips was appointed chapter 11 trustee by order of the court dated May 21, 2002. On April 2, 2003, trustee paid Amoco the $2,100,000.00 in outstanding trade credit and reduced to $3,000,000.00 the amount owed by FMP to Amoco.

Trustee moved the court on April 24, 2003, for an order setting an administrative claims bar date and establishing the procedures for allowance of and objections to administrative claims. The court entered an order on May 8, 2003, setting an administrative claims bar date of June 11, 2003, requiring parties asserting administrative claims to complete administrative claims forms and establishing June 25, 2003, as the last date on which parties could object to any administrative claims filed. Amoco did not file an administrative claims form.

In December 2003, trustee and Amoco settled litigation related to the roll-up portion of the $3,000,000.00 loan to FMP. On January 7, 2004, Amoco received as part of that settlement $394,612.00, which represented one half of the $789,224.00 that trustee previously held in escrow in connection with the dispute over the roll-up portion of the loan. By agreement of trustee and Amoco, the entire $789,224.00 was to be applied against Amoco's alleged direct claim, reducing it to $2,210,776.00.

On February 16, 2004, trustee filed his first omnibus objection to various priority claims, including each of Amoco's eight proofs of claim. Trustee objected to claim number 744 on the ground that it was misclassified as a priority claim when it was in fact a general unsecured claim. Trustee objected to Amoco's remaining seven claims as duplicative of claim number 744.

Hearing on trustee's omnibus objection was held April 29, 2004. In support of its claims against debtors, Amoco put forth two arguments. First, Amoco argued that it had an administrative and a secured claim against debtors derivative of the claims of FMP. Second, Amoco argued that it has direct claims against debtors because debtors received the benefit of the financial agreement struck by Amoco and FMP. Amoco alleged that debtors were able to continue operating post-petition only because Amoco allowed FMP to use $3,000,000.00 in cash that was immediately payable to Amoco to instead assist debtors through infusions of cash and trade credit.

As stated above, the court has denied Amoco's derivative claims and now considers the direct claims.

## RELATIONSHIP OF THE PARTIES

Before filing their petitions debtors operated approximately 170 service stations. Historically, FMP purchased Amoco branded motor fuel from Amoco and sold it to debtors for resale at their convenience stores. Debtors' retail customers often purchased Amoco fuel and other items in debtors' convenience stores by credit card. Amoco processed those credit card transactions and remitted amounts received from the banks to FMP. FMP in turn remitted those amounts to debtors. Debtors generally paid for the Amoco fuel delivered to their stores by FMP within ten days by either remitting cash payments to FMP or by allowing FMP to offset credit card receivables otherwise owed by FMP to debtors.

Additional facts are stated below.

## POSITIONS OF THE PARTIES

### A. Amoco

Amoco alleges that it has a $2,210,776.00 direct administrative claim against debtors because this is the remaining balance under the $3,000,000.00 note executed by Amoco and FMP. Amoco alleges that debtors were able to continue to operate post-petition because Amoco agreed to allow FMP to keep $3,000,000.00 in cash for which Amoco had a right to immediate payment.[1] The retention of this $3,000,000.00 in cash allowed FMP to serve as debtors' DIP lender under the Grid Note. Amoco further alleges that debtors were able to continue operating post-petition because Amoco continued providing ten day credit terms for fuel purchases.

Amoco provides several reasons why its direct administrative claim against debtors should be found valid. First, Amoco ar-

gues that although it did not file an administrative claims form, the proofs of claim it filed on March 1, 2002, were sufficient formal and informal notice of its administrative claim. Second, Amoco argues that it will be significantly harmed if debtors and FMP are not substantively consolidated and the administrative claim paid by debtors. Amoco dealt with debtors and FMP as a single economic unit, and equity demands that debtors repay Amoco for the financial assistance that enabled them to operate post-petition. Third, Amoco argues that given the benefit conferred upon debtors by Amoco's financial involvement with the parties, the court should find a contract implied in fact or law between Amoco and debtors. Finally, Amoco argues that the over $4,200,000.00 advanced to debtors by FMP under the Grid Note was DIP financing that debtors have not, in fact, repaid. Amoco therefore alleges that because its $3,000,0000.00 note enabled this DIP financing by FMP, Amoco is entitled to repayment by debtors under the Grid Note.

### B. Trustee

Trustee alleges several reasons why Amoco does not have a valid direct administrative claim against debtors. First, trustee argues that the Credit and Security Agreement executed post-petition by Amoco and FMP did not provide any benefit to debtors' estates. Amoco's choice to forego a cash payment in favor of taking FMP's $3,000,000.00 note did not enable FMP to extend debtors credit under the Grid Note. Debtors did not need FMP to provide DIP financing because they had a substantial amount of cash when they filed their petitions, and the Grid Note transactions were merely normal intercompany trade credit transactions. Second, trustee

1. Amoco accepted the $3,000,000.00 note from FMP so that FMP could retain this cash.

argues that no contract implied in law or fact can be imposed on the relationship between Amoco and debtors. There can be no contract implied in fact because Amoco has not provided evidence of facts upon which the court can find a meeting of the minds between debtors and Amoco with respect to a debt owed by debtors to Amoco or debtors' agreement to pay such debt. There also can be no contract implied in law because Amoco has not provided evidence upon which the court could find that debtors' received a benefit from Amoco's decision to extend credit to FMP. Third, trustee argues that substantive consolidation is improper because debtors and FMP were not one economic entity but acted both adversely to and independent of one another, and consolidation would render debtors' estates administratively insolvent. Finally, trustee argues that all debts owed by debtors to FMP, including the amounts represented on the Grid Note that Amoco asserts exist only as a result of the Amoco–FMP Credit Agreement transaction, have been repaid in full.

### *Conclusions of Law.*

Initially, it will be helpful to recap the circumstances surrounding Amoco's direct administrative claim. Pre-petition, debtors purchased petroleum products from FMP. FMP purchased these products from Amoco. At the time the bankruptcy petitions were filed on March 9, 2001, debtors had no direct contractual relationship with Amoco. However, FMP owed Amoco approximately $8,000,000.00. On March 15, FMP and Amoco executed a Credit and Security Agreement. Under this agreement, FMP acknowledged its obligation to Amoco, paid Amoco $2,362,145.00 toward the debt, and executed a promissory note to Amoco in the amount of $3,000,000.00. Because FMP executed this note it was allowed to retain this amount of cash for future operations,

rather than further reduce its obligation to Amoco. Thereafter FMP continued to purchase fuel from Amoco under ten day credit terms.

On March 19, 2001, FMP began to provide DIP financing to debtors that would enable debtors to continue purchasing fuel. In this transaction, debtors executed a Grid Note payable to FMP, and during the month of March, FMP advanced funds to debtors totaling over $4,200,000.00. Thus, post-petition FMP continued to purchase fuel from Amoco that FMP in turn sold to debtors to sell in their retail operations. Debtors were able to purchase the fuel because of the financing provided by FMP.

Debtors were never parties to the Credit and Security Agreement between FMP and Amoco, and debtors never executed any document obligating them to repay FMP's debt to Amoco.

Amoco's administrative claim in the amount of $2,210,776.00 is based upon FMP's failure to repay the debt that was the subject of the March 15, 2001, Credit and Security Agreement. The amount of the claim is the result of subtracting a $789,224.00 settlement of a portion of FMP's indebtedness to Amoco from the $3,000,000.00 due under the Amoco–FMP note.

### ADMINISTRATIVE CLAIM PROCEDURE

 Section 503 of the Bankruptcy Code states that "[a]n entity may timely file a request for payment of an administrative expense." 11 U.S.C. § 503(a). Unlike a proof of claim, which according to Rule 3001(a) should "conform substantially to the appropriate Official Form," an administrative expense claim need not take any particular form under the Code or Rules. Fed. R. Bankr.P. 3001(a). However, in some situations a proof of claim filed pursuant to Bankruptcy Rule 3001 can sat-

isfy the Code § 503 procedure for requesting payment of an administrative expense. This court has previously held that a proof of claim "plainly labeled as a claim for a post-petition administrative expense" or that in substance "describes an administrative expense" satisfies § 503. *In re Sage Richmond, LLC*, 285 B.R. 364, 365–66 (Bankr.E.D.Va.2002). Although a request for payment of administrative expense is not the same as a proof of claim, to deny an administrative claim clearly set forth in a proof of claim elevates form over substance. *See In re Sage Richmond, LLC*, 285 B.R. at 366.

In this case, although Amoco did not file an administrative claims form, Amoco's administrative claim is not procedurally barred because the proofs of claim filed on March 1, 2002, provided sufficient notice of the administrative nature of Amoco's claim. The eight timely filed proofs of claim described Amoco's claim against debtors' estate as a § 507(a) claim, one for administrative expenses allowed under § 503(b). Amoco would have been well advised to file an administrative claims form out of an abundance of caution, but other parties to the case were sufficiently put on notice of the administrative nature of Amoco's claim against debtors' estate through the proofs of claim.

## SUBSTANTIVE CONSOLIDATION

■ As noted, Amoco asserts that the court should substantively consolidate the debtors' estates and FMP. The Second Circuit has outlined a widely-used test for determining when it is appropriate to substantively consolidate the bankruptcy cases of more than one debtor. The test requires analysis of two factors: "(i) whether creditors dealt with the entities as a single economic unit and 'did not rely on their separate identity in extending credit'"[2] and "(ii) whether the affairs of the debtors are so entangled that consolidation will benefit all creditors." *Union Savings Bank v. Augie/Restivo Baking Co., Ltd. (In re Augie/Restivo Baking Co., Ltd.)*, 860 F.2d 515, 518 (2nd Cir.1988). For an excellent review and analysis of the case of law on substantive consolidation, *see In re Bonham*, 226 B.R. 56 (Bankr.D.Alaska 1998).[3]

■■ Substantive consolidation should be "used sparingly" to prevent injustice. *Id.* at 76. The concept has been applied to consolidate debtor and non-debtor parties; however, this requires an even more cautious application of the usual test. *Id.* at 83; *see also In re Lease–A–Fleet, Inc.*, 141 B.R. 869 (Bankr.E.D.Pa.1992). In this court's opinion, substantive consolidation to effectively declare a non-debtor to be a bankruptcy petitioner would require most unusual and compelling circumstances.

This case does not involve unusual or compelling circumstances, and the court finds no basis to substantively consolidate the debtors with FMP. Amoco dealt with debtors and FMP as separate entities. Although Amoco points out in its post-hear-

**2.** *Union Savings Bank v. Augie/Restivo Baking Co., Ltd. (In re Augie/Restivo Baking Co., Ltd.)*, 860 F.2d 515, 518 (2nd Cir.1988) (quoting 2 *Collier on Bankruptcy* ¶ 105.09[2][b] (Alan N. Resnick & Henry J. Sommer eds., 15th ed. rev.2004)).

**3.** Undoubtedly, substantive consolidation in the appropriate case may benefit creditors and facilitate administration. However, it is not a procedure prescribed by the Bankruptcy Code, and there is persuasive academic argument that there is no authority in bankruptcy law for substantive consolidation of cases. *See* Daniel B. Bogart, *Resisting the Expansion of Bankruptcy Court Power Under Section 105 of the Bankruptcy Code: The All Writs Act and an Admonition from Chief Justice Marshall*, 35 Ariz. L.J. 793, 810 (Fall 2003); J. Maxwell Tucker, *Groupo Mexicano and the Death of Substantive Consolidation* 8 Am. Bankr.L.Rev. 427 (Winter 2000). Even more questionable under this argument would be the consolidation of debtors with non-debtors.

ing brief that debtors and FMP shared a number of resources, the fact remains that Amoco executed the post-petition Credit and Security Agreement with FMP only. Even if, as Amoco suggests, FMP was a fiction, a company whose strings were pulled by debtors' principals, Amoco recognized FMP's independent significance by brokering a deal not with debtors or their principals but just FMP. The terms of the Credit Agreement itself also demonstrate how Amoco relied upon the entities' separate identities in extending credit. According to the Credit Agreement, Amoco took a $3,000,000.00 note from FMP in exchange for among other things an assignment of FMP's lien in debtors' fuel inventory. Such an assignment would not have been effective unless debtors and FMP were two separate entities whose obligations to one another could be transferred to a third party.

The court also finds that substantive consolidation is not appropriate because the affairs of debtors and FMP were not so entangled that consolidation would benefit all creditors. As convenience store retailers, debtors have creditors that conducted business on matters wholly unrelated to FMP. Consolidating debtors and FMP would increase total liabilities and certainly harm those creditors of debtors whose payout would decrease.

## CONTRACT IMPLIED IN FACT OR LAW

■■■■■ A contract implied in fact is "a true contract containing all necessary elements for a binding agreement except that it has not been committed to writing or stated orally in express terms, but rather is inferred from the conduct of the parties in the circumstances." *In re MBA, Inc. v. VNU Amvest, Inc. (In re MBA, Inc.)*, 51 B.R. 966, 974 n. 2 (Bankr.E.D.Va.1985). This type of contract must be based upon clear evidence of the parties' intent to contract and not upon the parties' course

of dealing. *See In re Virginia Block Co.*, 16 B.R. 771, 774 (Bankr.W.D.Va.1982).

■■■■■ A contract implied in law is an equitable remedy through which a court can impose contractual duties upon parties to a dispute in the interest of justice. *See G.T. Fogle & Co. v. United States*, 135 F.2d 117, 120 (4th Cir.1943). A court may invoke this equitable remedy when it finds evidence of three things: "1. a benefit conferred upon the defendant by the plaintiff; 2.[a]n appreciation or knowledge of the benefit by the defendant; and 3.[t]he acceptance or retention of the benefit by the defendant in circumstances which make it inequitable for the defendant to retain the benefit without paying for its value." *In re MBA, Inc.*, 51 B.R. at 974–75. This remedy is intended to prevent one party's unjust enrichment at the expense of the other and should be imposed only when there is insufficient evidence of a true contract or a contract implied in fact. *See id.* at 974; *Nossen v. Hoy*, 750 F.Supp. 740, 744–45 (E.D.Va.1990) (stating that the quasi-contract remedy is recognized under Virginia law as a method for recovering unjust enrichment).

■■■■ The court finds no contract implied in fact between Amoco and debtors because there was no meeting of the parties' minds. Amoco provided testimony at hearing that debtors and trustee repeatedly assured Amoco that its financial assistance was needed in order for debtors to continue operating. These assurances appear to have been made, however, in the context of Amoco's continued extension of trade credit and not in the context of providing any loan to debtors either directly or indirectly (through FMP). Debtors readily admitted at hearing and in their post-hearing briefs that if Amoco had not extended trade credit debtors would not have been able to continue operating and later complete a going concern sale of their assets. There was no evidence, however,

that Amoco and debtors ever agreed to repay the amounts received by FMP from Amoco under the Credit and Security Agreement.

 Likewise, the court finds no reason to impose a contract in law in this case. Debtors did not benefit from the Credit and Security Agreement executed by Amoco and FMP because debtors had sufficient cash when they filed their petitions, and they needed Amoco only to extend trade credit in order to continue fuel operations at the convenience stores. Amoco can provide no direct evidence that the cash FMP was able to retain as a result of the Credit Agreement was paid to debtors, and the court has no reason to second guess the testimony provided on behalf of debtors. Furthermore, debtors were not unjustly enriched by the results of the Credit Agreement between Amoco and FMP because debtors provided credible testimony that they have repaid all amounts due to FMP.

REPAYMENTS BY DEBTORS TO FMP

Amoco's final argument supporting the validity of its direct administrative claims is that debtors have not repaid all amounts debtors owe FMP under the Grid Note, and those amounts should be paid to Amoco. As stated above, debtors provided testimony of several witnesses that directly contradicts this position. This testimony was particularly credible, and, as the court stated from the bench at hearing, it was clear that no debt is owed from debtors to FMP. The court therefore finds that there are no amounts outstanding under the Grid Note, and Amoco is therefore not entitled to any payment according to its terms.

A separate order will be entered.